549 A.2d 27

**In re RACHEL T.**

**No. 400, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Nov. 1, 1988.

22

Elizabeth Renuart (Janet C. Bayer, on the brief), Frederick, for appellant, Rachel T.

Donna R. Heller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant, Carroll County Dept. of Social Services.

Charles O. Fisher, Jr. and Sandra F. Haines (Walsh & Fisher, on the brief), Westminster, for appellees.

Argued before WILNER, ROSALYN B. BELL and POLLITT, JJ.

ROSALYN B. BELL, Judge.

Rachel T. is the six-year-old daughter of George and Kathleen T. In August of 1987, a master determined that Rachel was a Child in Need of Assistance. Rachel's parents filed exceptions to the master's decision, and after a *de novo* hearing, the Circuit Court for Carroll County reversed the master's decision. The Department of Social Services for Carroll County (Department) and Rachel T. appeal, contending that the trial court should have admitted certain out-of-court statements made by Rachel. The Department also contends that, even in the absence of these statements, the evidence overwhelmingly supported a finding that Rachel needed court protection. We vacate the judgment and remand.

The facts leading up to this appeal are as follows. On March 30, 1987, at about 6:20 p.m., Mrs. T., Rachel's mother, found Rachel in an upstairs bathroom sitting on the toilet. Mrs. T. discovered blood in the toilet after Rachel

left the room. Although Mrs. T. knew that the blood had come from Rachel, she did not ask her any questions, or examine her to ascertain the severity or origin of Rachel's bleeding. She went instead to the kitchen to wait for her husband to return from work. After Mr. T. arrived home at about 6:50 p.m., Mrs. T. showed him the blood in the toilet, and they returned to the kitchen where she served Mr. T. his supper. Mr. T. suggested to his wife that perhaps Rachel was starting her period early. Rachel was not quite five at this time. When Rachel came into the kitchen 15 or 20 minutes later, Mr. T. noticed blood on the back of her nightgown. Mrs. T. telephoned her own mother, who told her to call Rachel's pediatrician. The pediatrician's receptionist told Mrs. T. to locate the source of the bleeding and, for the first time that day, Mrs. T. examined Rachel. In the interim, Rachel's father discovered more blood in a downstairs toilet. Mrs. T. made an appointment for Dr. Ignatowski, Rachel's pediatrician, to see her at 8:00 p.m.

When Dr. Ignatowski examined Rachel, he found a fresh tear in her hymen, a significant amount of blood in the vaginal vault, and clotted blood in Rachel's rectum. He also found that her rectal sphincter muscle was abnormally dilated. Rachel's vaginal hymenal opening measured 15 millimeters, a serious abnormal finding because a measurement exceeding five millimeters is considered to be significantly enlarged. Dr. Ignatowski knew that he must refer Rachel to a sexual child abuse specialist as soon as he saw the condition of her hymen. Dr. Ignatowski related that, when he had performed a routine examination of Rachel a year earlier, she had presented none of these disturbing abnormalities. Dr. Ignatowski also found remarkable the relaxed ease with which Rachel endured his examination. Based on his own experience as a pediatrician and upon the relevant medical literature, this indicated chronic sexual abuse. After he examined Rachel, Dr. Ignatowski spoke to her parents about his findings, telling them that he would personally make an appointment for Rachel with a pediatric

gynecologist. Mrs. T. was reluctant to have Rachel seen by the pediatric gynecologist, denying the possibility of sexual abuse, suggesting instead that Rachel must have somehow injured herself. The parents did, however, bring Rachel the next day to see Dr. Timothy Doran.

Dr. Doran is the Assistant Medical Director of the Chesapeake Clinic at the Francis Scott Key Medical Center. Francis Scott Key is one of three rape centers in the Baltimore area. The center uses an interdisciplinary approach: that is, when appropriate, a female social worker may be asked to interview a young female child to gather a medical history, if the child seems to be uncomfortable with an adult male. In the instant case, Dr. Doran, in accordance with his usual procedure, asked the social worker to take Rachel's history because she was unwilling to talk to him. When asked about the source of the bleeding, Rachel told the social worker that she had a secret with her Dad and that if she told her Mom her father would be in big trouble. The history was then incorporated into the hospital's medical record.

Dr. Doran, an expert in pediatric gynecology and the evaluation of sexually abused children, discovered that Rachel's vaginal opening and hymen were extremely dilated, and the widest he had seen in any child under the age of 10. He also found diminished anal sphincter tone, which is a sign of sexual abuse if found in conjunction with a gaping hymenal orifice. It was Dr. Doran's opinion that Rachel had been victimized by on-going sexual abuse. Dr. Doran spoke to the Department about his findings, and a Department staff member referred Rachel and her family to Dr. Gladys Sweeney, a clinical psychologist specializing in sexual abuse cases.

Dr. Sweeney saw Rachel and her parents on four occasions. At the first session, Dr. Sweeney presented Rachel

with anatomically correct dolls.[1] Rachel took the male adult doll, pulled his pants down, showed Dr. Sweeney the doll's penis and said, "[T]his is his tutor." When asked if she had ever seen a tutor, Rachel replied, "Yes, my daddy's." Rachel grabbed the male doll's penis, put it in the female doll's genitalia and said, "Tutor goes in here, too." Rachel named the female doll "Cindy" and said that the male doll was Cindy's daddy. She told Dr. Sweeney that Cindy's daddy had hurt Cindy by putting his "tutor" inside her. When asked to show what had happened, Rachel depicted intercourse with the dolls.

At the next session with Dr. Sweeney, Rachel spontaneously repeated this sequence with the dolls. She told Dr. Sweeney that her father had on two occasions put his "tutor" in her, and that it had hurt. Rachel told Dr. Sweeney that her father had told her that she was going to cry a lot if she told. Rachel then showed Dr. Sweeney with a doll how her Daddy spanked her with a paddle, and then threw the doll to the floor and screamed, "You're a bad girl."

Mrs. T. told Dr. Sweeney that she was convinced that Rachel had been injured at nursery school. Mrs. T. tried to get Rachel to confirm that something had happened at nursery school (and not at home), but Rachel refused to do so. Mr. T. expressed a lot of anger, stating that men were always accused of sexual abuse. He told Dr. Sweeney that he often found it necessary to spank Rachel with a stick.

Dr. Sweeney related that, near the end of a session with Rachel's parents, Rachel, who had been waiting outside, began knocking on the door to come into the room. Mr. T. looked at the door and stated, "That's why we have a stick in the house." It was Dr. Sweeney's opinion that Rachel had been sexually abused, and she relayed this information to the Department.

---

1. These dolls are a standard tool used by experts in diagnosing sexual abuse.

On June 18, 1987, the Department filed a petition for shelter care and, after a hearing that same day, Rachel was removed from the house and placed in a foster home. On June 25, 1987, the Department, pursuant to Md.Cts. & Jud.Proc.Code Ann. § 3–801(e) (1974, 1984 Repl.Vol.), filed a petition alleging that Rachel was a Child in Need of Assistance (CINA). Specifically, the Department's petition alleged that medical evidence indicated sexual abuse, that Rachel had indicated that her father was the abuser and had threatened her with corporal punishment. The petition further alleged that Rachel's parents had not provided the sympathetic and supportive environment she needed in order to avoid or minimize permanent emotional damage, and that Rachel had been put under intense pressure by her mother to confirm that the abuser was someone other than her father.

On August 5, 1987, the master found Rachel to be a CINA, after considering extensive testimony from Drs. Doran and Sweeney, as well as testimony from other Department witnesses. In a disposition hearing a few days later, the master was informed that Mr. T. was willing to move out of the house so that Rachel could be returned to her mother. In early September of 1987, Rachel was returned home.

The trial court conducted its *de novo* hearing on Rachel's parents' exceptions to her CINA status during February and April of 1988. The trial court, relying on *Cassidy v. State*, 74 Md.App. 1, 536 A.2d 666 (1988), excluded statements made by Rachel to three different people. The first set includes those portions of Dr. Doran's testimony which were based on Rachel's statements to the social worker who took her medical history and which identified her father as the abuser. The second set consists of statements made by Rachel to Dr. Sweeney about her daddy's "tutor," as well as statements made by Rachel which, in Dr. Sweeney's opinion, showed unusual detail of sexual matters for a child

of five. Thirdly, the trial court excluded statements Rachel made to her foster mother, which also implicated her father.

At the close of the evidence, the trial judge stated:
"[W]e're not here today to decide who did it. Everybody has stipulated that the child was sexually molested in one form or the other...."
He concluded that Rachel was not a CINA because he could not make a finding that Rachel's parents were unwilling or unable to give her proper care and attention.

After first giving a brief overview of the CINA statute, we analyze these three groups of allegedly hearsay statements and explain why two of the groups should have been admitted and considered by the trial judge.

—The CINA Statute—

A child in need of assistance is defined as a child requiring court protection because
"(1) He ... is not receiving ordinary and proper care and attention, and
(2) His parents ... are unable or unwilling to give proper care and attention to the child and his problems...."
Md.Cts. & Jud.Proc.Code Ann. § 3–801(e) (1974, 1984 Repl. Vol.). Allegations that a child is in need of care and assistance must be proved by a preponderance of the evidence. § 3–819(d).

The purpose of a CINA proceeding is to protect children and promote their best interests. It is not intended to punish the parents, and the statute limits the juvenile court's authority to orders designed to protect the child. *In re Neil C.*, 308 Md. 591, 597, 521 A.2d 329 (1987). A CINA proceeding is aimed at accomplishing this protective purpose by temporarily separating the child from his parents *or* by supervising the parents in the raising of their child. *In re Colin R.*, 63 Md.App. 684, 697, 493 A.2d 1083 (1985). In *Colin R.*, 63 Md.App. at 697, 493 A.2d 1083 we pointed out the distinction between a CINA proceeding and a paren-

tal rights termination action, stating that the latter was a "much more drastic and permanent interference...." The standard of proof in a parental rights termination is therefore higher. Clear and convincing evidence is necessary to justify such a determination. Md.Fam. Law Code Ann. § 5–313 (1984).

■ Appellants contend that, because § 3–812(e) of the CINA statute[2] provides that hearings should be conducted in an "informal manner," formal rules of evidence should not be applied at these hearings. We do not agree.

In *Colin R.*, 63 Md.App. at 684, 493 A.2d 1083, we held that a hospital record, containing urine sample results tending to show that Colin's mother had regularly given him diuretics, was admissible under the business record exception contained in Md.Cts. & Jud.Proc.Code Ann. § 10–101 (1974, 1984 Repl.Vol.). We observed in *Colin R.* that, because there had been no suggestion that the laboratory record was erroneous, the burden was on Colin's parents to produce a witness to demonstrate weakness or error in the record. *Colin R.*, 63 Md.App. at 693, 493 A.2d 1083. More important to our purpose here, we stated, in response to Colin's parents' reliance on *Moon v. State*,[3] 300 Md. 354, 478 A.2d 695 (1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985):

"The instant case is a juvenile C.I.N.A. proceeding, not a criminal prosecution, and the right of confrontation appli-

---

**2.** Section 3–812(e) is set forth in its entirety:

"(e) The court shall conduct all hearings in an informal manner. It may exclude the general public from a hearing, and admit only those persons having a direct interest in the proceeding and their representatives."

**3.** In *Moon*, the Court of Appeals held that admission of a blood test report for intoxication violated the defendant's Sixth Amendment right to confront his accusers, where the report's declarant was available at trial and the report was facially unreliable. *Moon*, 300 Md. at 370, 478 A.2d 695

cable in *Moon* is not available to the parents of an alleged C.I.N.A."

*Colin R.*, 63 Md.App. at 693–94, 493 A.2d 1083.

Although the rule against hearsay and the right of confrontation are designed to protect similar values, the latter, of course, is applicable only to an accused in a criminal prosecution. *McCormick on Evidence*, § 252 at 749 (3rd ed. 1984). We do not interpret *Colin R.*, however, as standing for the proposition that all hearsay evidence is admissible in a CINA proceeding. In *Colin R.*, we did not address the issue of whether the rules of evidence were relaxed in such cases.

In *In re Beverly B.*, 72 Md.App. 433, 530 A. 766 (1987), we held that any admission of certain alleged hearsay statements was harmless error because the trial court had not rested its decision that Beverly needed court protection on the contents of these statements. In *In re Wanda B.*, 69 Md.App. 105, 516 A.2d 615 (1986), we held that a court-ordered psychiatric report was admissible at a CINA proceeding under the hearsay exception for court-ordered Juvenile Services Agency reports.[4] While the issue has not been directly raised, these decisions indicate that standard rules of evidence have been assumed to apply at CINA proceedings.

We do not agree with appellants that the various changes made by the Legislature through the years mean that it intended that hearsay evidence be admitted without limitation. The 1916 version of the statute provided that hearings in all cases of "dependent neglected or delinquent

---

4. Md.Cts. & Jud.Proc.Code Ann. § 3–818 (1974, 1984 Repl.Vol., 1987 Cum.Supp.), provides a hearsay exception for particular reports as follows:

"(a) After a petition or a citation has been filed, the court may direct the Juvenile Services Agency or another qualified agency to make a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case."

The report is admissible at a waiver hearing or a disposition hearing, but not at an adjudicatory hearing.

children" were to be conducted "without regard to technicalities of procedure or the rules of evidence...." 1916 Md.Laws, ch. 326. The 1945 version of the Act eliminated the provision which stated that the rules of evidence should not apply, but retained the provision that hearings were to be conducted in an "informal manner." Sec. 48J, Md. Laws Ch. 797. The Act underwent considerable change in 1969, and the provision regarding informality of hearings was completely deleted at that time.[5] In 1975, when major revisions were again made in the Act, the informality provision was replaced in the statute and continues without change to this day. Appellants have provided no history nor have we located any independently which indicates why the Legislature originally added the provision relative to the rules of evidence and then deleted it.

▮ Appellants argue that the only reasonable inference that can be drawn from these changes is that the Legislature intended that the rules of evidence be "somewhat relaxed" in order to effectuate the purpose of the Act. Additionally, appellants argue that the so-called "tender years" exception, effective July 1, 1988, Md.Cts. & Jud. Proc.Code Ann. § 9–103.1, manifests a legislative recognition that the rules of evidence are not to be applied as stringently in CINA cases. The tender years exception allows out-of-court statements of child abuse victims to be introduced in criminal cases only. One of the first drafts of the legislation would have made the exception applicable to all judicial proceedings. As ultimately enacted, however, the portions of the Act concerning "any judicial proceeding" were deleted, and the legislation now only applies to state-

---

**5.** The legislative history indicates that the provision was deleted in response to the Supreme Court's decision in *In Re: Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In that case, the Court held that an alleged delinquent child had certain constitutional rights, such as access to records, written notice of the specific charges, right to counsel, and the right to be confronted with live, sworn testimony and the right to cross-examine all witnesses. *Gault,* 387 U.S. at 33, 40–56, 87 S.Ct. at 1446, 1450–59.

ments made by child victims in criminal proceedings.[6] Specifically, appellants argue that this deletion illustrates that the Legislature assumed that it was unnecessary to include noncriminal judicial proceedings, since the rules of evidence were not to be applied anyway. We think the more likely and obvious explanation is simply that the Legislature meant what it said and intended the tender years exception to apply only in criminal cases. In the cases we cited earlier, *Colin R., Beverly B.,* and *Wanda B.,* we implicitly recognized that the rules of hearsay *do* apply in CINA cases. Indeed, the CINA statute itself contains a hearsay exception—that contained within § 3–818. *See* n. 4, *supra.* There would be no reason for the Legislature to provide § 3–818 *unless* the rules of evidence were to be applied. Moreover, even if the Legislature *had* extended the tender years exception in CINA cases, there are two reasons why it would be inapplicable here. First, it was not enacted until after this proceeding, and it contains a provision stating that it is to be applied only prospectively. H.B. 1018, ch. 549, § 2.[7] Secondly, even under the tender years exception, the child "must be subject to cross-examination about the out-of-court statement and testif[y]" at either the trial or by closed circuit television.[8]

---

6. *See* H.B. 1018, ch. 549 (1988).

7. § 9–103.1, Md.Cts. & Jud.Proc.Code Ann.

8. This restriction applies *unless* the child is dead, absent (and presence cannot be procured by subpoena), seriously physically disabled, or is unable to communicate due to serious emotional distress, and there must be corroborative evidence of the statement. § 9–103.1(c)(2)(I) and (II). Maryland's tender years exception has been criticized:
 "Hopefully, once the courts have had occasion to construe this new hearsay exception statute, the legislature will realize that the exception is more than fair to defendants. The legislature should extend the exception to other appropriate criminal and appropriate civil proceedings, should make it available when the child is incompetent to testify, and should permit its use regardless of the status of the person to whom the child made a reliable statement."
 McLain, *Maryland's Statutory Hearsay Exception for Reliable Statements by Alleged Child Abuse Victims: A Hesitant Step Forward,* 17 U.Balt.L.Rev. 1 (1987).

—Rachel's Statements to Member of Dr.
Doran's Treatment Team—

Appellants contend that the trial judge, relying on our opinion in *Cassidy,* erroneously excluded all of Rachel's statements concerning the "big secret" she shared with her father. It will be remembered that Rachel made these statements to a social worker who, at Dr. Doran's request, took her medical history because Rachel was unwilling to confide in him. We agree with appellants that these statements were admissible under both the treating physician and business record exceptions to the rule against hearsay. We explain.

The classic definition of hearsay is an out-of-court assertion offered in court for the truth of the matter asserted, and thus resting for its value on the credibility of the out-of-court declarant. *Cassidy,* 74 Md.App. at 6, 536 A.2d 666. In *Cassidy,* we pointed out that the burden is on the proponent to show that a hearsay statement falls within an exception. *Cassidy,* 74 Md.App. at 8, 536 A.2d 666.

One exception to the rule against hearsay are statements made to a physician consulted for medical treatment. A physician may testify as to the medical history related to him or her by a patient, and may also state a conclusion reached on the basis of that history. *Candella v. Subsequent Injury Fund,* 277 Md. 120, 123, 353 A.2d 263 (1976). The rationale behind this exception is that the patient's statements are apt to be sincere and reliable because the patient knows that the quality and success of the treatment depends upon the accuracy of the information presented to the physician. *Candella,* 277 Md. at 123–24, 353 A.2d 263. As we stated in *Cassidy,* "[n]o one would willingly risk medical injury from improper treatment by withholding necessary data or furnishing false data to the physician who would determine the course of treatment on the basis of that data." *Cassidy,* 74 Md.App. at 26, 353 A.2d 263. To be admissible under this exception, the hearsay statements about the cause of the injury must be related to

diagnosis or treatment—statements as to causation which merely fix fault or identify a culprit do not fit the underlying rationale of the exception. Consequently, statements made to a nontreating physician, such as an expert preparing for an upcoming trial, are not admissible as substantive evidence, although they are admissible to explain the basis of the physician's conclusions. *See Beahm v. Shortall*, 279 Md. 321, 327, 368 A.2d 1005 (1977). The declarant's subjective purpose in making the statement to the physician is therefore vitally important in determining whether the exception should apply.

Turning to the statement in the instant case, there is no doubt that it is hearsay. Rachel's statement to the social worker who took her history at Dr. Doran's request is an out-of-court statement, and it was offered by the Department for its substantive truth, *i.e.*, that her father had inflicted severe sexual abuse on Rachel. The accuracy of this statement, of course, depends upon Rachel's credibility and as Rachel did not testify at the CINA proceeding, its truth could not be tested by cross-examination.

In *Cassidy*, we held that a two-year-old female victim's statements that "Daddy did this" were inadmissible under the treating physician exception. *Cassidy*, 74 Md.App. at 50, 536 A.2d 666. *Cassidy* concerned the criminal prosecution of the child's father for sexual abuse. The statements in *Cassidy* were made to a medical doctor who examined the child three days after the alleged abuse, and who testified for the State. We rejected the State's contention that these statements qualified under the exception because the two-year-old declarant in *Cassidy* "was not advanced enough to possess the concerned physical self-interest which is at the very core of this particular evidentiary theory." *Cassidy*, 74 Md.App. at 30, 536 A.2d 666. The declarant, in *Cassidy*, was simply too young to understand why she was visiting the physician. We held in *Cassidy* that, even *if* the two-year old had been old enough to understand the nature of her interview with the doctor, the statement, "Daddy did this," was not related to the child's

medical treatment because the only symptoms of the two-year old in *Cassidy* were three-day-old bruises.

In the instant case, however, a very different set of circumstances existed. At the time the statement was made, Rachel was to turn five in a few weeks. There is a vast difference between the cognitive development of a two-year old and a child of five. The content of Rachel's statement itself indicates a certain degree of sophistication. From the content, one can tell that Rachel understood that the alleged "secret" shared with her father was an important one; one which potentially could result in trouble for him. When the social worker met with Rachel, she explained to Rachel that the reason for Dr. Doran's examination and questions were "because we were worried and wanted to see why there had been blood in her panties and in the toilet." Thus, Rachel knew that her statements would be used to provide appropriate treatment. Additionally, the persistent bleeding probably affected Rachel—the universally frightening nature of unexplained blood would have disturbed her and made her apt to tell the truth in order to become better. Granted, by the time Rachel saw Dr. Doran, the bleeding had stopped, but it was recent enough to retain its sobering character. Rachel's concern about the bleeding was supported by her later fear of going to the bathroom, as related by her counsellor, and her insistence upon keeping the door open.

Dr. Doran was a treating physician because Rachel's regular pediatrician referred Rachel and her parents in order to ascertain the cause of Rachel's bleeding. He was not consulted in order to provide expert testimony at some future date. A significant medical history was needed by Dr. Doran in order to treat Rachel effectively. It was vitally important for Dr. Doran to determine the cause of the hymenal injury and trauma, and thus the identity of the abuser.

Important to our decision in *Cassidy* was that the identity of the child's abuser was not related to medical treatment. In *Cassidy*, the evidence of abuse was primarily external—

the child was bruised on the arms, legs, and buttocks. We noted in *Cassidy*, however, that "[w]hen there is a danger that an assault victim may have contracted a communicable disease, of course, the identity of the assailant may take on significant medical pertinence." *Cassidy*, 74 Md.App. at 34 n. 14, 536 A.2d 666. Unlike the child in *Cassidy*, the evidence, including the blood and Rachel's abnormally dilated hymen, presented this potential danger. For example, it was possible that Rachel had been exposed to a venereal disease, and may have required antibiotics. Additionally, Rachel's parents suggested that her bleeding and dilated hymen may have been caused by some inanimate object such as a broomstick. If that had been the case, a tetanus shot might have been required. Dr. Doran testified that, although he had no specific recollection of seeing Rachel more than once, his usual practice is to have a child return for a follow-up visit, to see if other medically significant findings appear and to decide whether to recommend that the child be referred for psychiatric treatment. Ascertaining the identity of the abuser was also important in the instant case because effective treatment might have required Rachel's removal from the home. Dr. Doran, having tried unsuccessfully to elicit information himself from Rachel, asked his specially trained social worker to speak to Rachel. He testified that use of this interdisciplinary team method was common practice where a child was unwilling to talk to a doctor, and that he relied on the information in making his diagnosis and prescribing treatment. We hold that the trial judge erroneously excluded these statements.

■ Moreover, Rachel's statements in the instant case were admissible under the business records exception contained in Md.Cts. & Proc.Code Ann. § 10–101 (1974, 1984 Repl.Vol.). Because the regular course of a hospital's business is the care and treatment of patients, hospital records containing entries of events that are "pathologically germane" to that treatment are admissible under § 10–101. *State v. Garlick*, 313 Md. 209, 221–22, 545 A.2d 27 (1988). In order to be considered "pathologically germane," the

entry must have significant relation to the condition which caused the patient to come to the hospital for treatment. *Garlick*, 313 Md. at 222, 545 A.2d 27. *See also Yellow Cab Co. v. Hicks*, 224 Md. 563, 570, 168 A.2d 501 (1961); *Marlow v. Cerino*, 19 Md.App. 619, 635, 313 A.2d 505, *cert. denied*, 271 Md. 739 (1974). "Pathologically germane" includes facts helpful to an understanding of the medical aspects of the case. *Garlick*, 313 Md. at 222, 545 A.2d 27.

These statements were recorded by the social worker and incorporated into the hospital's medical records. Rachel was taken to Francis Scott Key Hospital to see Dr. Doran because her treating physician referred her so that cultures and specimens could be taken. But for her pediatrician's findings of a fresh hymenal tear and dilated sphincter, Rachel would not have gone to the hospital. As we pointed out before, the identity of Rachel's abuser was essential to her effective treatment, and thus the information recorded into the medical record by the social worker was "pathologically germane."

—Rachel's Statements to Dr. Sweeney—

■ We hold that the trial court erred in striking from Dr. Sweeney's testimony Rachel's statements about her father's "tutor," as well as statements made to Dr. Sweeney, via the dolls, which showed Rachel's unusual sexual precocity. Dr. Sweeney used this information to form her expert opinion that Rachel had been abused by her father. Rachel's statements were therefore data which formed the basis of her opinion, and were thus not offered as substantive proof. *Beahm*, 279 Md. at 327, 368 A.2d 1005. Recognizing that experts are presumably as competent as judge or jury in assessing the reliability of statements made to them, expert testimony, though based in part on otherwise inadmissible hearsay, is admissible when the underlying information is of a kind customarily relied upon by experts in the field. *Attorney Grievance Commission v. Nothstein*, 300 Md. 667, 683–84, 480 A.2d 807 (1984). We see little sense in allowing Dr. Sweeney's opinion without the data which supports it.

—Rachel's Statements to Her Foster Mother—

 During the summer of 1987, Rachel was placed in a foster home pursuant to court order. At the trial, the Department presented the testimony of Rachel's foster mother, who testified that she had overheard Rachel say to a male playmate, "I want to see if your tutor is as big as Daddy's." She also testified that Rachel had refused to let her wash her in the bath "because that's where Daddy had put his tutor." Out-of-court statements, offered for their truth, are inadmissible as hearsay absent circumstances bringing the statements within a recognized exception. *Kapiloff v. Locke*, 276 Md. 466, 471, 348 A.2d 697 (1975). Appellants present no hearsay exception to fit these statements. Instead, the Department contends that it did not offer these statements for their truth, *i.e.,* that Rachel's father had sexual intercourse with Rachel, but offered them to show evidence of precocious sexuality, a principal theory on which the Department relied to show that Rachel was a CINA. If these statements showed precocious sexuality on Rachel's part, they were merely cumulative to other evidence showing that Rachel had been sexually abused, a matter on which everyone involved in the proceeding below agreed. As such, their omission was harmless. It appears to us that the Department instead was using the statements to show that Rachel's family was not providing proper care because the father was the abuser. When viewed in this light, the statements were being offered for their truth and constitute hearsay. We hold that the trial court did not err in excluding these statements.

—Final Observations—

 It was undisputed that Rachel had been sexually abused and the trial judge did make that factual finding. Uncontroverted testimony indicated that Rachel's injuries had been caused by repeated penetration by a penis or some other object of similar size. The trial judge did not, however, address the obviously chronic nature of the abuse or the identity of her abuser. The trial judge erroneously

excluded several of Rachel's statements that would have enabled him to make more specific factual findings regarding the source of Rachel's abuse. Factual findings were important in the instant case in order to make an informed determination of whether Rachel required court protection or supervision. If an immediate family member, *i.e.*, her father, had chronically abused her in the past, it was more likely that Rachel could be the victim of similar abuse again, by virtue of her father's proximity.

The Department contends that, even in the absence of the erroneously excluded statements, a preponderance of the evidence showed that Rachel was a CINA. There are several cogent arguments supporting this position. Uncontroverted testimony indicated that Rachel's injuries had been caused by repeated penetration by a penis or some other object of similar size. If the abuse had occurred within her home, it was very possible that her father was the abuser. Therefore, her mother either knew and did nothing, or should have known and was negligent. If Rachel was regularly abused *outside* the home, her parents were clearly derelict in not having been aware of the severe injuries Rachel had sustained *before* the night the blood was discovered.

The actions of Rachel's parents on that night illustrate some inattention to her needs. In a four-year-old, blood is a fairly reliable indication that something serious is wrong. When Rachel's mother discovered the blood in the toilet, she made no attempt to examine Rachel. The record indicates that at no time did either parent ask Rachel what had happened, nor did they comfort Rachel or ask if she was in any pain. The trial judge made no determination as to what the events of the day meant, nor did he draw any inferences from Rachel's parents' inaction, but simply stated:

"I think the child is in need of assistance, but under the law I don't feel that the—there's just no evidence there that from the legal standpoint, in my view, that the Court can provide that assistance, so it's gonna [sic] be up to the parents to provide the assistance to your daughter."

**40** 

On remand, the trial judge must make his findings on the record in order that we may properly make our review. Therefore, we direct the trial court to consider Rachel's statements, along with our foregoing observations, in making the determination as to whether Rachel was in need of court protection. We suggest that this be done as expeditiously as possible.

JUDGMENT VACATED.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES. MANDATE TO ISSUE FORTHWITH.