705 A.2d 67

**Boyd Caleb LOW**

v.

**STATE of Maryland.**

**No. 395, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Jan. 29, 1998.

Paul E. Alpert, J. (retired), specially assigned, dissented and filed opinion.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Emmet Davitt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Robert Dean, State's Atty. for Montgomery County, Rockville, on the brief), for Appellee.

Argued before THIEME and BYRNES, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

THIEME, Judge.

Boyd Caleb Low, the appellant, was convicted by a jury in the Circuit Court for Montgomery County of second degree rape, second degree sexual offense, and child abuse. On appeal, he raises five questions, which we have reordered and reworded:

1.  Did the trial court err in finding that the State's expert was a treating physician who was permitted to relate hearsay?

2.  Did the trial court err in denying a mistrial after the court itself referred to what "the defendant" did instead of what "the perpetrator" did?

3.  Did the trial court err in excluding from evidence the fact that the Department of Social Services had determined that a previous complaint by the victim was unfounded?

4.  Did the trial court err in admitting the appellant's statement that he had kissed the victim?

5.  Did the trial court err in permitting the prosecutor to suggest that the child victim "pretend like it is just you and me in the room"?

Because we reverse the decision of the trial court based on the first issue presented on appeal, we need not reach the merits of the remaining four issues.

### *Background*

The appellant is the brother-in-law of Janine Knott. When Janine was eleven years old, her father died. The appellant and his wife then moved in with Janine's family, and the appellant undertook Janine's care and supervision during those times when her mother was away from the home.

At trial, Janine testified that the appellant took her to his bedroom and to a shed in the yard at times when no other adults were home. With great reticence, Janine testified that appellant touched her in a "private part" in the "front" and in the "back," and that he "stuck something into me," which hurt. She made an in-court identification of the appellant. On cross-examination, Janine admitted telling several lies, including one that got the appellant into trouble with her mother.

On 30 April 1996, Janine was examined by Dr. Narita Estampador–Ulep, a pediatrician and child abuse expert. Janine was then twelve years old. The doctor testified that Janine's vagina and anus both showed evidence of trauma and penetration by a foreign object. In relating what Janine had told her, the doctor did not refer to the appellant by name or by the designation "defendant." She further testified that Janine told her that she was hurt when "the perpetrator" put his penis in her vagina and in her "butt" more than ten times. We shall reserve for that portion of our opinion dealing with issue one further facts related to the testimony of Dr. Estampador–Ulep.

The appellant denied abusing Janine and attributed her dislike of him to his attempts to fulfill her father's role as disciplinarian. On cross-examination, Janine admitted that this made her angry.

Following a four day trial the appellant was convicted of the aforementioned offenses and subsequently sentenced to consecutive terms of incarceration totaling 55 years, with all but

sixteen years suspended, to be followed by a term of probation. This timely appeal was then noted.

### The Legal Foundation

The appellant first complains that the trial court erred in ruling that Dr. Estampador–Ulep was a treating physician and, ergo, it erred in admitting various portions of her testimony at trial. In addressing that issue, we seek guidance from Maryland Rule 5–803, entitled "Hearsay Exceptions: Unavailability of Declarant Not Required." Subsection (b)(4) of that rule specifically provides that the following statements are admissible at trial regardless of availability of the declarant:

*Statements for Purposes of Medical Diagnosis or Treatment.*—Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

A decade ago this Court had occasion to consider the rationale behind the rule in *Cassidy v. State,* 74 Md.App. 1, 536 A.2d 666 (1988).[1] In that case, Cassidy was convicted by a

---

1. The dissent acknowledges our decision in *Cassidy* but states that because *Cassidy* is so factually distinguishable from the instant case, the substantive analysis undertaken in it is not directly applicable to the case at bar. We do not take issue with the proposition that the facts in *Cassidy* differ from those now before us. As the dissent correctly explains, the child victim in *Cassidy,* who was two years old, did not testify. Furthermore, the doctor in that case, who testified at trial, stated that when the victim was asked "Who did this?" she replied "Daddy [Cassidy] did this." The victim in the case now before us did testify and at no time did Dr. Estampador–Ulep testify that Janine affirmatively identified the appellant as the perpetrator.

Preliminarily, we find it noteworthy that, although Janine did testify, her testimony was vague and gave virtually no factual details. Numerous recesses were taken between repeated attempts to elicit an answer to the question "What bad thing did [the appellant] do to you?" Finally, after being granted permission to lead the witness, the State

jury of child abuse and assault stemming from alleged acts of physical abuse committed upon the two-year-old daughter of Cassidy's live-in girlfriend. Central to that case was whether Cassidy was, in fact, the perpetrator of the acts. Three days after the occurrence of the abusive conduct that formed the basis for the charges against Cassidy, the victim was brought to Prince George's County General Hospital, where she was examined by Dr. Pullman, a representative of Child Protective Services. During the course of the examination, Dr. Pullman noticed several signs of physical abuse, as well as potential sexual molestation. When asked on several occasions, "Who did this to you," the victim simply replied, "Daddy." [2] 74 Md.App. at 5–6, 536 A.2d 666.

The State offered as one of several theories of admissibility that the victim made the declarations to a physician consulted for the purpose of treatment. 74 Md.App. at 25, 536 A.2d 666. In exploring that contention, we explained the traditionally recognized rationale behind admitting such statements, notwithstanding their presumptive untrustworthiness as hearsay:

Whether dealing with existing bodily feelings, past symptoms, or medical history as to the cause or source of the bodily condition, the guarantee of trustworthiness was precisely the same. Spontaneity was no longer the guarantee.

was able to obtain from Janine only the testimony that she had been touched on her "privates" in the "front" and in the "back." Janine was still unable to provide a clear picture of what had allegedly occurred. Therefore, although technically testifying, unlike the victim in *Cassidy*, the victim in the case at bar—because she provided so little valuable information—most assuredly shed little light on the events of the abuse.

We cannot conclude as does the dissent that because the two cases are factually dissimilar that the legal analysis undertaken in *Cassidy* is inapplicable to the case before us. The detailed analysis of a treating versus examining physician undertaken by Judge Moylan in *Cassidy* is binding precedent on us that is in no way eroded due to the factual dissimilarities between the two cases.

**2.** Although it appears that the appellant in *Cassidy* was not the child's biological father, the evidence indicated that the victim nevertheless referred to him as "Daddy." Thus, there was no dispute as to whom the victim was referring when answering questions posed by the doctor.

The guarantee, rather, was that no one would willingly risk medical injury from improper treatment by withholding necessary data or furnishing false data to the physician who would determine the course of treatment on the basis of that data.

74 Md.App. at 26, 536 A.2d 666; *see also Candella v. Subsequent Injury Fund,* 277 Md. 120, 124, 353 A.2d 263 (1976) (testimony by a treating physician as to the medical history of a patient "is admitted under an exception to the hearsay rule, the underlying rationale being that the patient's statements to his doctor are apt to be sincere when made with an awareness that the quality and success of treatment may largely depend on the accuracy of the information provided the physician"); *Parker v. State,* 189 Md. 244, 249, 55 A.2d 784 (1947) ("It may be seen that, when attended by a physician for the purpose of treatment, there is a strong inducement for the patient to speak truly of his pains and sufferings. . . .").

That exception to the hearsay rule does not apply, however, when the physician is acting in a capacity other than as a treating physician. In the case of an examining physician, for example, the guarantee of trustworthiness that accompanies the testimony of a treating physician is no longer present. As the Court of Appeals explained in *Candella, supra,* at 124, 353 A.2d 263:

In Maryland, however, we have not extended this principle [of allowing an attending physician to testify as to the medical history as related by the patient] to include the case in which the patient's history has been related to a nontreating physician, *Rossello v. Friedel,* 243 Md. 234, 241–42, 220 A.2d 537 (1966); *Wilhelm v. State Traffic Comm., supra,* 230 Md. [91] at 97, 185 A.2d 715 [1962]; *see Wolfinger v. Frey,* 223 Md. 184, 190–91, 162 A.2d 745 (1960); *Parker v. State,* 189 Md. 244, 248–50, 55 A.2d 784 (1947); in these instances, the trustworthiness which characterizes the declaration is no longer assured, since the patient is aware that the statements are being received primarily to enable the physician to prepare testimony on his behalf rather than for purposes of diagnosis and treatment.

Thus, while statements made to an examining physician may be admitted at trial, they may be so admitted *only* for the limited purpose of showing the expert's reasons for his or her opinion. The hearsay statements may not, however, be admitted as substantive evidence. *Cassidy,* 74 Md.App. at 28–29, 536 A.2d 666 (citing *Beahm v. Shortall,* 279 Md. 321, 327, 368 A.2d 1005 (1977)).

With the foregoing law as our predicate, we continued in *Cassidy* to determine whether the victim's assertions to Dr. Pullman that, in effect, "Daddy did this," were made to a treating physician and admissible at trial despite the fact that they were undisputably hearsay, or whether they were made only to an examining physician and, accordingly, inadmissible hearsay. For numerous reasons, we held in *Cassidy* that the victim's statements to the physician did not qualify as statements made in contemplation of medical treatment because Dr. Pullman was not a treating physician.[3] The critical reason espoused by our Court was because it could not be shown from the record that the victim in *Cassidy* "ha[d] a strong motive to speak truthfully and accurately because the treatment or diagnosis [would] depend in part upon the information conveyed." 74 Md.App. at 29, 536 A.2d 666. To the contrary, the evidence indicated that the two-year-old victim in that case possessed no understanding as to why Dr. Pullman was questioning her. We further explained:

> The doctrinal predicate—the underlying reassurance of trustworthiness—upon which this entire exception to the Hearsay Rule rests was, therefore, entirely lacking in this case. The two-year-old declarant did not understand the nature or purpose of her interview with Dr. Pullman. She was not mature enough to appreciate the critical cause-and-effect connections between accurate information, correct medical diagnosis, and efficacious medical treatment. She

---

**3.** In *Cassidy,* this Court listed various reasons why the statements should have been excluded at trial. Because only some of those reasons are directly applicable to the case before us, we need not and do not reiterate the entire opinion.

was not advanced enough to possess the concerned physical self-interest which is at the very core of this particular evidentiary theory.

74 Md.App. at 30, 536 A.2d 666.[4]  The bottom line in *Cassidy* was that the assertions by the two-year-old child to the physician were inadmissible hearsay.

### *The Factual Foundation*

Turning to the instant case, the underlying facts that neither the parties nor this Court disputes are as follows:  Dr. Estampador–Ulep, a pediatrician and child abuse expert, was employed by the Montgomery County Department of Health and Human Services ("DHHS");  then twelve-year-old Janine was referred to Dr. Estampador–Ulep by a social worker for a complete medical evaluation;  during the course of her examination of Janine, Dr. Estampador–Ulep performed a comprehensive review of the child, including eyes, ears, nose, throat, skin, cardiovascular, muscular, skeletal, central nervous system, social adjustment, and sleeping disturbances, as well as ordering laboratory tests;  during the course of that examination, Dr. Estampador–Ulep noted evidence of sexual trauma to Janine;  subsequent to the examination, Dr. Estampador–Ulep was of the opinion that no further medical treatment of Janine was necessary;  and, Dr. Estampador–Ulep never saw Janine again.

The State and trial court alike viewed those facts in their totality as a sufficient definition of a "treating physician" within Rule 5–803(b)(1).  Because Dr. Estampador–Ulep was at best an examining physician, we cannot agree.

---

4.  We further pointed out that the assertion "Daddy did this" was in no way germane or necessary to the medical treatment of the child.  We readily acknowledged that Dr. Pullman obviously may have had a "social obligation" to the victim to see to it that she be extracted from any potentially abusive situation.  Nevertheless, we recognized that the social concern is not the same as a medical concern for the purposes of the exception to the hearsay rule.  74 Md.App. at 36–37, 536 A.2d 666.

*Reconciling the Legal Foundation
with the Factual Foundation*

█    In finding that Dr. Estampador–Ulep was a treating as well as an examining physician for the purpose of Rule 5–803(b)(4), the trial court considered the plethora of testimony elicited on the issue and ultimately held:

> Based on the testimony that I have heard, it is clear, number one, that Dr. Estampador–Ulep is an examining physician.
>
> I cannot conclude that she is only an examining physician who came into this case solely for the purpose of rendering an opinion as an expert with respect to child abuse or sexual abuse.
>
> The examination here was not only for that purpose, regardless of how Janine came to her, but was also for the purpose of possible treatment.
>
> Her exam went further than just an exam of the genital or rectal or anal area. She examined the patient in her entirety for possible treatment.
>
> And I cannot but conclude that based on the testimony I have heard in this case that Dr. Estampador–Ulep was an examining and a treating physician.

None of the reasons given by the trial court as to why Dr. Estampador–Ulep was a treating physician is availing. We explain.

First, the doctor's standard operating procedure of taking an oral history from the patient's parent, meeting with the patient, and asking the child patient if he or she knew why he or she was there does not in and of itself qualify her as a treating physician. Dr. Estampador–Ulep testified that after following the previous procedures she then "might say mom or dad is concerned about your health because of some unhappy experience that might have happened to you." There was, however, no evidence adduced at trial that Janine was in fact asked if she knew why she was there, or, even if asked, what Janine's reply might have been. In other words, Dr. Estampador–Ulep's usual operating procedure, even if employed in

relation to Janine, did not give the impression of a doctor who would necessarily treat Janine on future occasions. In fact, when asked by defense counsel what her purpose was in conducting the examination of Janine, Dr. Estampador–Ulep replied only "[f]or complete medical evaluation." No mention was made by the doctor of potential treatment.

Second, Dr. Estampador–Ulep also testified that had the examination of Janine suggested the need for further medical treatment she would then have asked Janine's mother if she wished Dr. Estampador–Ulep to perform that treatment or preferred that Janine's private physician continue such treatment. The doctor also explained that had Janine's mother wanted her to provide the treatment she could have and would have provided it. For two reasons, however, this fact does not qualify the doctor as a treating physician under the applicable rule.

Preliminarily, this Court is not entirely convinced by the record that Dr. Estampador–Ulep "could have" provided such continuing treatment to Janine even had her mother so desired. In the Shady Grove Adventist Hospital Report prepared as a result of the examination of Janine, the following language appears on a page entitled "Follow–Up Instructions—Sexual Abuse and Assault":

You can continue care at one of these agencies:

1. Your personal physician
2. STD Clinic, Montgomery County Health Department, Silver Spring, 217–1760
3. Community Clinics
4. Community Health Centers
5. Planned Parenthood
6. Other _____

Check marks were placed next to items number one (your personal physician) and three (community clinics) as potential options for Janine. Not only was there no suggestion that Janine could receive follow-up treatment from Dr. Estampador–Ulep at DHHS, but, according to the form, that was not

even an option for Janine's mother to pursue. And, with the obvious inclusion of a catchall category of "other" with the capability of specifying another mode of treatment on a blank line, we have trouble understanding why Dr. Estampador–Ulep's name was not inserted as an option under number six if she could have subsequently treated Janine.

Nevertheless, even assuming for the sake of argument that Dr. Estampador–Ulep could have provided Janine with subsequent treatment, the subjective beliefs of the doctor as to what she could and would do are immaterial to the issue. The heart of the issue returns to the guarantee of trustworthiness emphasized in *Cassidy*, and, in order to maintain that trustworthiness, Janine must have contemplated the possibility of further treatment by the doctor. The fact that Dr. Estampador–Ulep thought she could give Janine follow-up treatment does not mean that Janine knew she could receive such follow-up treatment from the doctor, absent evidence that Dr. Estampador–Ulep *communicated* those intentions to Janine or Janine's mother. And in the case at bar we have no such evidence before us. Additionally, even if Dr. Estampador–Ulep had rendered treatment, her doing so would have been incidental and secondary to her primary role as a forensic examiner.

Third, in determining that Dr. Estampador–Ulep was a treating as well as an examining physician, the trial court relied on the fact that Janine was given a complete physical examination in areas other than those affected by the alleged sexual abuse. We cannot reach the conclusion, as did the trial court, that because Janine was examined in areas of her body other than those pertaining to potential sexual abuse she necessarily realized that the doctor could perform further treatment of her. The conclusion that we instead draw is that a child of twelve years,[5] who has never before been seen by a

---

5. Although Janine was significantly older than the child victim in *Cassidy*, given the facts in this case we do not believe that a twelve-year-old child any more than a two-year-old child would have assumed that Dr. Estampador–Ulep was examining her for the purpose of subsequent

doctor (and will never again be seen by this doctor), who is poked at and prodded in virtually every area of her body, and who is asked a multitude of questions, some quite sensitive in nature, is most likely, at the very least, an extremely intimidated little girl, who has little grasp of why she was sent to this strange doctor in a strange setting. If anything, Janine had a right to be downright suspicious as to why the doctor was examining her in body areas other than those stemming from the complained of incident, and that, in our opinion, would have promoted Janine's distrust of and perhaps dishonesty with the doctor much more than it would have facilitated a relationship of trust. As we pointed out in *In re Rachel T.*, 77 Md.App. 20, 34, 549 A.2d 27 (1988), the declarant's subjective purpose in making any statements to a physician is of vital importance in determining whether to admit those statements as substantive evidence even though hearsay. And, given the facts before us, we find no evidence that Janine's subjective intent when being examined and interviewed by Dr. Estampador–Ulep was to communicate potential ailments or abuse in hopes of further treatment.

In sum, given the specific facts in this case, we can reach no other conclusion except that Dr. Estampador–Ulep saw Janine for the sole purpose of examining and detecting child abuse. We do not doubt that, under a different set of circumstances, Dr. Estampador–Ulep *could have* provided Janine with additional treatment if necessary. Nevertheless, Dr. Estampador–Ulep was, in essence, a part of the prosecution team. At no time did she render treatment to Janine, and the doctor's subjective observation that she might have rendered treatment had treatment been necessary should not control the determination of her role for purposes of the admission of hearsay evidence. Put in general terms, the mere ability to render treatment does not automatically give rise to the inference that one is categorically a "treating physician" as Rule 5–803(b)(4) contemplates the term. Something more is

---

treatment. The age discrepancy in the two cases presents no meaningful distinction for purposes of our analysis.

needed than the mere possibility that further treatment could be rendered. If that were not the case, then *any* DHHS doctor who examines a child would qualify as a treating physician within 5–803(b)(4). Or, taken to its utmost extreme, any *doctor* who examines an individual could arguably "treat" that individual if necessity called for it. Would, then, every doctor who examines a person qualify as a "treating physician?" Certainly not, or the rule would be rendered utterly meaningless.

▋ Furthermore, there is no question that the appellant was prejudiced by Dr. Estampador–Ulep's testimony in the case at bar. Granted, Janine did testify at trial, but only as a very reluctant witness whose testimony was at best vague and disjointed and at worst incoherent. Therefore, it cannot be said by any stretch of the imagination that the doctor's testimony was merely a recitation or reinforcement of what Janine herself had already testified.

Because we are not willing to extend Rule 5–803(b)(4) beyond what we believe to be the intent of that rule, we shall reverse the judgment of the trial court.

**JUDGMENTS REVERSED; COSTS TO BE PAID BY MONTGOMERY COUNTY.[6]**

PAUL E. ALPERT, Judge (retired), Specially Assigned, dissents with an opinion.

PAUL E. ALPERT, Judge (retired), Specially Assigned, dissenting.

I respectfully dissent from the majority's holding that the trial judge erred in allowing Dr. Estampador–Ulep to testify as a treating physician.

---

**6.** Due to our resolution of the first issue presented in this appeal, we need not discuss the merits of the remaining four issues. For guidance to the trial court, and to prevent any possibility that the issues will resurface before this Court in the future, we acknowledge that having considered those issues we find no error in the actions of the trial court.

In discussing this issue, my focus is upon Rule 5–803(b)(4), which provides:

*Statements for Purposes of Medical Diagnosis or Treatment*—Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

At trial, appellant challenged the status of Dr. Estampador–Ulep, claiming that she was merely an examining physician, who could not relate Janine's statements as substantive evidence. Rule 5–803(b)(4), *Cassidy v. State*, 74 Md.App. 1, 536 A.2d 666, *cert. denied*, 312 Md. 602, 541 A.2d 965 (1988).[7] After hearing evidence and argument on this issue, the trial court determined that the doctor was both a treating and an examining physician. Appellant challenges that ruling as error. For several reasons, I agree with the trial court's conclusion.

Initially, I note that the facts of this case differ significantly from those in *Cassidy*. In *Cassidy*, the distinction between an examining physician and a treating physician mattered because the child victim did not testify. The testimony that identified Cassidy as the perpetrator consisted of the doctor asking the child, "Who did this?" and the child replying, to the doctor, "Daddy [Cassidy] did this." Two important differences exist in the instant case: The child victim testified and identified appellant as the perpetrator, and the doctor did not

---

7. Not at issue in this case is the statute regarding out-of-court statements made by child abuse victims under the age of twelve years. Md.Code Ann., Article 27, § 775 makes the hearsay testimony of "a licensed physician" admissible whether or not the child testifies, if the statement possesses particularized guarantees of trustworthiness and is not admissible under any other hearsay exception. Before admitting such a statement, the trial court must make certain findings on the record, and the State must have provided the defendant with certain notices within a specified time.

relate any statement by Janine that identified anyone. To the contrary, she testified that Janine did not tell her the name of the person who raped her. When asked, specifically, "Did you know who it was?" she answered no.

Because of these differences, the analysis of examining versus treating physician undertaken in *Cassidy,* and also *In re Rachel T.,* 77 Md.App. 20, 549 A.2d 27 (1988), is not directly applicable. At the time that the *voir dire* was conducted, however, the doctor had not yet testified, and the possibility that she would testify as to hearsay had not been eliminated entirely. Therefore, I will examine other reasons why the trial court's decision was correct.

On *voir dire,* Dr. Estampador–Ulep testified that she was employed by the Montgomery County Department of Health and Human Services. A social worker referred Janine to Dr. Estampador–Ulep for a complete medical evaluation. The doctor's standard procedure was to take an oral history from a patient's mother, then to meet with the patient. Her usual introduction was to ask if the child knew why he or she was there, and "then I might say mom or dad is concerned about your health because of some unhappy experience that might have happened to you." She had no reason to think she had done otherwise with Janine.

Dr. Estampador–Ulep performed a review of human systems, including eyes, ears, nose, throat, skin, cardiovascular, respiratory, gastrointestinal, genital urinary, endocrine, muscular, skeletal, central nervous system, social adjustment, drug use, sleeping arrangements, and sleeping disturbances. She ordered laboratory tests. Nothing in the results of these examinations suggested the need for medical treatment. If the results had indicated such a need, the doctor would have inquired whether Janine's mother wanted her to provide treatment or whether she wished to return to a private physician for treatment. Had Janine's mother wanted treatment, Dr. Estampador–Ulep could and would have provided it.

Thus, it is abundantly clear that the victim's statements were, at the very least, "made for purposes of ... *medical*

*diagnosis in contemplation of treatment* and describing ... pain, or sensation ... as reasonably pertinent to treatment or *diagnosis in contemplation of treatment.*" (Emphasis added)

At *voir dire* examination, outside of the presence of the jury, the following exchange occurred:

Q   Okay. Did there come a point in the exam when you ordered lab work to be done on Janine?

A   Yes. I did.

Q   And what was the purpose of that lab work?

A   Depending on the history of the child as far—

MR. BLUMBERG: Objection, objection.

THE COURT: Overruled. I think is it germane to the issue of whether or not—it is germane to the issue that we are trying to determine here.

BY MS. DWYER:

Q   You may answer. What was the purpose in ordering lab work?

A   Depending on the history the child gives me and what the physical findings I would have, I would have to do cultures from anal or vaginal cavities and I have to do that for sexually transmitted disease and that is why the history of the physical examination is critical as far as—

THE COURT: What happens if your lab work indicates that all is not normal? That is not necessarily a medical term but I have a reason for phrasing it that way, What happens if—if all is not well? What do you do?

THE WITNESS: If all is not well then we go ahead and get the child—go ahead and get the child or I might ask mother if the child has her own private physician and she wants the child to be treated by her own private physician.

And I sometimes call the private physician and they might ask me to go ahead and treat and then they would follow this child up.

BY MS. DWYER:

Q   Okay. Have you done that before?

A   I have you done that before, yes.

Q   Okay. What is follow-up treatment?

A   Follow-up treatment is if the child has an infection I would give the medication and then after the medication has been completed the child is re-cultured just to be very sure the infection is absolutely treated.

THE COURT: What did you do in this case?

THE WITNESS: In this case I did—we did hepatitis, sexually transmitted infection like serology for syphilis; we did cultures for gonorrhea.

THE COURT: Those are the lab tests you are talking about.

THE WITNESS: Yes.

THE COURT: Was there any—were there any abnormal findings?

THE WITNESS: None.

BY MS. DWYER:

Q   Dr. Estampador, do you ever have occasion to make counseling referrals?

A   Yes. I always do recommend mental health counseling for a child, sometimes for the parents or sometimes just for the mother.

Q   Okay. did you do that in this case?

A   Yes.

THE COURT: You recommended follow-up counseling? Is that what you said?

THE WITNESS: Right.

BY MS. DWYER:

Q   Dr. Estampador, is your follow-up treatment limited to sexually transmitted diseases or diseases of a vaginal or anal area?

A   No. I have complaints of healing, problem eyes, ears, nose or throat or skin. Difficulties—some concerns about hygiene or some concerns that the mother would

want to talk about regarding behavior of the child in school or at home.

MR. BLUMBERG: Objection.

THE WITNESS: I do—

THE COURT: Did you ever see her again?

THE WITNESS: No. I did not see Janine again.

BY MS. DWYER:

Q   Can you finish the answer?

MR. BLUMBERG: Objection. She is talking about in general, not in regard to this case.

MS. DWYER: But that is not—that is not the standard. It is not whether in this case—

THE COURT: I understand.

MS. DWYER:—she is a treating physician or an examining physician. It means the—the standard is is she somebody called in to just take a look at this child's vaginal area—

THE COURT: I think evidence of habit, routine practice, is admissible under the rules of evidence.

BY MS. DWYER:

Q   Doctor, I asked you is follow-up treatment limited to any sexually transmitted diseases, vaginal or anal problems?

A   No.

Q   Would you?

A   Yes.

Q   And have you?

A   I have.

THE COURT: If the child did not have a family physician, would you see the child again?

THE WITNESS: Yes. I would. If mother is willing to come and see me.

THE COURT: So it—would it be possible that you would have ongoing treatment with the child?

THE WITNESS: Yes.

THE COURT: For more than one or two visits?

THE WITNESS: Right.

Relying on this testimony, the trial court found that Dr. Estampador–Ulep was a treating physician as well as an examining one:

I cannot conclude that she is only an examining physician who came into this case *solely* for the purpose of rendering an opinion as an expert with respect to child abuse or sexual abuse.

The examination here was not only for that purpose, regardless of how Janine came to her, but was also for the purpose of possible treatment.

(Emphasis added.)

This is in accordance with the language of Rule 5–803(b)(4), which provides that statements made for the purpose of medical treatment *or medical diagnosis in contemplation of treatment* are not excluded by the hearsay rule. (Emphasis added.)

*Returning to Cassidy*, there we noted that the rationale for this hearsay exception is that a patient would not willingly risk medical injury from improper treatment by withholding or falsifying data to the physician who would provide treatment. The patient's "subjective purpose in making the statement to the physician is therefore vitally important in determining whether the exception should apply." *In re Rachel T.*, 77 Md.App. at 34, 549 A.2d 27. In describing the victim's history, Dr. Estampador–Ulep declared

As far as complaints she said that she did have pain in her vagina area for one whole day after the allegations—after supposedly abuse.

In the landmark case of *Beahm v. Shortall*, 279 Md. 321, 368 A.2d 1005 (1977), the late Judge Charles E. Orth, Jr., speaking for the Court of Appeals, stated:

We have made a distinction between a treating physician and a nontreating physician. Our latest word on the matter

appears in *Candella v. Subsequent Injury Fund,* 277 Md. 120, 353 A.2d 263 (1976), in which we summarized the law:

> We have applied in this State the universally recognized principle that an attending physician may testify as to the medical history related to him by his patient, and may also state his conclusions reached on the strength of that history.... Such testimony is admitted under an exception to the hearsay rule, the underlying rationale being that the patient's statements to his doctor are apt to be sincere when made with an awareness that the quality and success of the treatment may largely depend on the accuracy of the information provided the physician.
>
> In Maryland, however, we have not extended this principle to include the case in which the patient's history has been related to a nontreating physician, ...; in these instances, the trustworthiness which characterizes the declaration is no longer assured, since the patient is aware that the statements are being received primarily to enable the physician to prepare testimony on his behalf rather than for purposes of diagnosis and treatment. 277 Md. at 123–124, 353 A.2d at 265 (footnotes omitted).

*Beahm,* at 323–324, 368 A.2d 1005.

Can there be doubt that the complaints of pain by the 11–year–old victim were anything but sincere?

As with proof of intent or motive, subjective purpose cannot be directly and objectively proven and is often proved from conduct or extrinsic acts. *Cf. Johnson v. State,* 332 Md. 456, 471, 632 A.2d 152 (1993). Janine did not testify about her subjective purpose in talking with Dr. Estampador–Ulep. Because she had made a report of sexual abuse, appellant assumes that Janine necessarily perceived the doctor only as an examining physician. It is clear from the doctor's testimony, however, that Janine was conscious throughout the examination and, therefore, can be presumed to have known that she was being examined in areas of her body unrelated to sexual activity, for example, her eyes, ears, nose, throat, cardiovascular, and respiratory systems. An equally permissi-

ble inference from this evidence is that Janine perceived the doctor to be capable of diagnosing and treating medical problems whether or not they were related to sexual abuse.

After a lively discussion with the prosecutor and defense counsel, the trial judge carefully reviewed the evidence and rendered a thoughtful decision:

THE COURT: Okay. The evidence or the testimony and the evidence in this case indicates from Dr. Ulep—indicates that she is employed by the Department of Health and Human Services as a pediatrician and examines and treats, to use her words, victims of sexual abuse.

She saw Janine K[ ] on April 30th at shady Grove Hospital and she examined her. Janine had been referred by a social worker for complete evaluation.

The doctor testified that it is her routine practice to talk to the patient, get the history from either the mother or some other adult caretaker and then she talks to the child with respect to the child's history.

She introduced herself to Janine, asked her why she knew she was at the hospital. She took a past medical history which included issues such as whether there was past injury or illness of any kind.

She examined and inquired about areas such as whether or not the patient had experienced menstrual cycle or not; whether she had vaginitis, allergies; whether she was currently on medication.

She verified the immunization status of Janine and at the moment I am just reading from my notes and I do not profess to have taken down every single thing that she had taken down of Janine with respect to her medical history.

But it is certainly here in State's Exhibit No. 8. She also did a review of human systems as she rephrased it, a review of systems which included eyes, ears, skin, cardiovascular, respiratory history, GI, GU, endocrine development, muscular, skeletal. Inquiries, questions about vertigo, head injuries, fainting, social adjustment, drug use, sleeping arrangements, sleep disturbance.

She inquired about various physical symptoms, abdomen, pelvic pain, vulvar discomfort or pain, urinary tract infections, vaginal itching and I am skipping some.

She did make inquiry about behavioral and emotional systems—symptoms such as sleep disturbances, eating disorders, sexual acting out, fear, anger, depression.

She made inquiry about any observations and recordation about general appearance, nutrition, posture, skin, head, ears, eyes, nose, neck, chest, breasts, abdomen, skeletal, neurological inquiries.

She made inquiries about post-assault hygiene activity and also did a physical exam with respect to the genital areas.

In essence, according to Dr. Ulep, she took a complete history with respect to the symptoms and medical background.

She conducted a physical exam, a gynecological exam and in addition examining the anus and buttocks area, the rectal area.

She ordered lab work to determine whether or not to treat the child or refer the child to a private physician.

If there is infection she would give medication for that infection. It happens that in this case there were no abnormal findings.

Dr. Ulep testified that if necessary she would have conducted follow-up treatment which would not have been limited to the vaginal or rectal areas from what the Court can determine.

If there were any abnormalities in any sense, medical abnormalities or areas that needed treatment, we would have treated the patient, in this case Janine K[ ], and would have conducted ongoing treatment if there in fact was no family physician to whom to refer the child to.

As I indicated, there was also lab work ordered.

Based on the testimony that I have heard, it is clear, number one, that Dr. Estampador–Ulep is an examining physician.

I cannot conclude that she is only an examining physician who came into the case solely for the purpose of rendering an opinion as an expert with respect to child abuse or sexual abuse.

The examination here was not only for that purpose, regardless of how Janine came to her, but was also for the purpose of possible treatment.

Her exam went further than just an exam of the genital or rectal or anal area. She examined the patient in her entirety for possible treatment.

And I cannot but conclude that based on the testimony I have heard in this case that Dr. Estampador–Ulep was an examining physician and a treating physician. So we will call the jury back in.

All of these factors lead me to conclude that the trial court did not err in permitting Dr. Estampador–Ulep to testify as both an examining and a treating physician. He did not abuse his discretion. I, therefore, respectfully dissent.