930 A.2d 1140

**Frederick Roscoe COATES**

v.

**STATE of Maryland.**

**No. 1943 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Aug. 30, 2007.

Anne K. Olesen, Washington, DC (Nancy Forester, Public defender, on the brief), Baltimore, MD, for Appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, DEBORAH S. EYLER,* and THEODORE G. BLOOM, (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This appeal requires us to consider Maryland Rule 5–803(b)(4), the hearsay exception for statements made "for purposes of medical diagnosis or treatment." We must determine, inter alia, whether the circuit court erred or abused its discretion in admitting statements made in November 2003 by Jazmyne T., a child sexual abuse victim, to a nurse practitioner. The child's out-of-court statements, made when she was

---

* Bloom, J., now deceased, participated in the hearing and conference of this case, and participated also in the decision and adoption of this opinion.

almost eight years old, were a key part of the State's evidence against Frederick Roscoe Coates, appellant, the former boyfriend of the victim's mother. At a trial held in May of 2005, a jury in the Circuit Court for Montgomery County convicted Coates of second degree rape (vaginal intercourse in the victim's bedroom; Count Two); second degree sexual offense (fellatio; Count Three); and child abuse (Count Five), for which he was sentenced to a total term of thirty-five years' imprisonment.[1]

Coates presents two questions for our review, which we quote:

I.   Did the trial court err in admitting the complainant's out-of-court statements as substantive evidence under the medical treatment and diagnosis exception to the hearsay rule, where the statements were made 14 months after any abuse had ended and the State failed to meet its burden regarding the declarant's state of mind?

II.  Did the trial court err in permitting an expert witness who offered the hearsay to also testify about the complainant's credibility?

For the reasons that follow, we shall reverse the convictions and remand for a new trial.

## I. FACTUAL AND PROCEDURAL SUMMARY

Jazmyne was born on December 19, 1995. The alleged acts of abuse last occurred in September of 2002, and were discovered in the Fall of 2003. A few weeks later, in November 2003, Jazmyne was examined by Heidi Bresee, a pediatric nurse practitioner. During the examination, Jazmyne made statements implicating appellant. On February 17, 2005, the State notified appellant that it intended to call Bresee as "an

---

1. The jury did not reach a verdict on Count One, charging second degree rape (vaginal intercourse in a bathroom at a mall), or Count Four, charging second degree sexual offense (anal intercourse). The court declared a mistrial as to those charges.

expert in forensic examinations of sexual assaults." In a letter to defense counsel on February 20, 2005, the State amplified the notice, stating:

Ms. Bresse [sic] will testify that her observations of the victim's vaginal area are consistent with Jazmyne's disclosure of vaginal penetration. Ms. Bresse [sic] will opine that an object penetrated Jazmyne's vagina. The object could be an adult male's penis or fingers. She has ruled out a child's fingers as the penetrating object. She will further opine that Jazmyne's hymen was narrow and that the loss of hymen occurred over time from abuse. The observations are consistent with repeated abuse.

The State may also introduce the videotape of the victim's sexual assault examination.[2]

On March 18, 2005, appellant filed a "Motion in Limine to Exclude Testimony," seeking, *inter alia,* to bar Bresee's opinion testimony and admission of the videotape. The defense argued, among other things, that Jazmyne's statements to Bresee were not admissible under Md. Rule 5–803(b)(4), the hearsay exception for statements made for purposes of medical diagnosis or treatment, because "Jazmyne was not seeking medical treatment when she spoke to Ms. Bresee." Further, appellant claimed that Ms. Bresee's opinion would invade the jury's role in judging the credibility of witnesses, because Bresee "would merely serve to vouch for" the credibility of Jazmyne.

In support of his position that Jazmyne was not seeking medical treatment at the time of her meeting with Bresee, appellant pointed to a statement Jazmyne made some ten days before the examination, in which she allegedly said she " 'wanted these people to go to jail.' "[3] The defense also

---

**2.** During discovery, the State produced the videotape of Bresee's sexual assault examination.

**3.** The court held a pretrial hearing on February 17, 2005, pertaining to the discovery of certain confidential records. Appellant sought records from the Montgomery County Child Protective Services ("CPS"), as well as records relating to "a child abuse investigation and a CINA

urged the court to consider that Jazmyne did not present in an emergency situation. Rather, she was seen "one year after the alleged incidents ended...." Moreover, appellant argued that Jazmyne "had no symptoms, no pain, and no injuries to be examined or treated," and Bresee "did not conduct a complete medical exam of Jazmyne, a complete pelvic exam, draw blood to test for sexually transmitted diseases, do vaginal swabs for gonorrhea and chlamydia, or provide any treatment."

The State countered that Jazmyne's statements were admissible under Rule 5–803(b)(4) because "they were taken and given for dual medical and forensic purposes." As evidence of a medical purpose for the exam, the State noted that Bresee referred Jazmyne for mental health counseling as well as HIV testing. Further, it maintained that Bresee's physical findings were consistent with the child's disclosure of sexual abuse.

At a motion hearing on April 7, 2005, defense counsel expressed concern that Bresee's testimony lacked a sufficient basis in fact and would not be limited to her physical findings. Rather, she would testify to "a significant connection" between the physical findings and appellant. The State responded that it would show that Coates had access to the child without regard to Bresee. The State also represented that it would only seek to use the videotape in the event that Jazmyne's credibility was impeached.[4] The court said, in part:[5]

---

proceeding." It appears that Jazmyne's statement that she "wanted these people to go to jail" is included in these confidential records.

The trial court determined that it would permit trial counsel to review the records, with the understanding that they would be inadmissible at trial without the court's permission. The record does not indicate that the court gave the defense permission to use the confidential records.

4. The videotape was never introduced at trial.

5. At the motion hearing, the court asked the prosecutor whether she intended to seek introduction of Jazmyne's statements to Bresee under Maryland's "tender years" statute. *See* Md.Code (2001, 2006 Supp.), § 11–304 of the Criminal Procedure Article ("C.P."). The court observed: "We've had no separate hearing on reliability and reporting

As I understand it, the questions to [Ms. Bresee] having to do with any allegations in this incident are ... whether or not certain findings were consistent with ... multiple acts of intercourse or penetration....

Ms. Bresee is not going to say having [sic] anything to do with [Coates's] access to [Jazmyne]. She's not going to say anything about that. The State's going to argue that, once they've brought out through someone else that there was access to the child, but they're not going to ask Ms. Bresee that question.

Denying the motion *in limine,* the court said:

Okay, I am going to deny the motion in limine with respect to Ms. Bresee based on the State's proffer as to the limited questions they intend to ask about the interview with Jasmine, and the issue of the physical findings as they relate to and [are] consistent with multiple acts of sexual intercourse [and/or] digital penetration.

At the time of trial, Jazmyne was nine and a half years of age. The following colloquy is relevant:

[PROSECUTOR]: And how are [boys and girls] different?

[VICTIM]: Because girls have vaginas and boys have penis.

[PROSECUTOR]: Okay. And have you ever seen a penis before.

[VICTIM]: Yes.

[PROSECUTOR]: Whose penis have you seen?

---

and so forth." *See* C.P. § 11–304(d)–(e). The State responded that it was not relying on C.P. § 11–304 as a means to admit the child's statements to Bresee. On appeal, neither party has addressed the admissibility of Jazmyne's statements to Bresee under the tender years statute, and we express no opinion as to the matter. *See generally Lawson v. State,* 389 Md. 570, 886 A.2d 876 (2005) (in case where child sexual abuse victim testified at trial, Court upheld admission of child's statements to social worker under C.P. § 11–304); *State v. Snowden,* 385 Md. 64, 867 A.2d 314 (2005) (in case in which child abuse victims did not testify, Court held that statements of child abuse victims to social worker were not admissible under C.P. § 11–304, in light of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

[VICTIM]: Bikie's.[6]

[PROSECUTOR]: Okay. Besides Bikie, have you seen anyone else's penis?

[VICTIM]: My brother.

[PROSECUTOR]: Okay. And what's your brother's name again?

[VICTIM]: Lorenzo.[7]

* * *

[PROSECUTOR]: ... Now do you call this something besides a vagina?

[VICTIM]: Yes.

[PROSECUTOR]: What do you call it?

[VICTIM]: A coochie (phoenetic [sic] sp.).

[PROSECUTOR]: A coochie. Okay. All right. Now, has anyone ever touched your coochie or your vagina?

[VICTIM]: Yes.

[PROSECUTOR]: Who has?

[VICTIM]: Bikie, Carl and Jemal [sic].[8]

[PROSECUTOR]: And Jemal [sic]. All right. And Carl. Who's Carl?

---

6. In opening statement, the prosecutor told the jury that Coates is known by the nickname of "Bikey" (also spelled "Bikie"). In her testimony, Ms. Jenkins identified appellant as "Bikie."

7. Lorenzo is not Jazmyne's biological brother. Later, Jazmyne seemed to contradict her earlier statement that she saw Lorenzo's penis. The following dialogue is relevant:

> [PROSECUTOR]: Jasmine, you said that sometimes Lorenzo would be at home when you and Bikie would [have sex]. Do you remember Lorenzo being at home?
> [VICTIM]: Yes.
> [PROSECUTOR]: And where was Lorenzo when you and Bikie would do it?
> [VICTIM]: With me.
> [PROSECUTOR]: And do you remember if there was ever, you said that you saw Lorenzo's penis?
> [VICTIM]: No. I didn't.

8. Lakisha Casey is a friend of Ms. Jenkins. Casey is also Lorenzo's mother and the cousin of Jamar Lee.

596

[VICTIM]: He is a man.  My grandmother's boyfriend.

\* \* \*

[PROSECUTOR]: All right.  And when you lived with Bikie, how did you feel about Bikie?

[VICTIM]: I felt first fine.  And then until it came to the doing it part, sort of bad.

[PROSECUTOR]: All right.  Well, let's go back to that. You said that when you would sleep at night, where would you sleep?

[VICTIM]: In my bed.

[PROSECUTOR]: And when people were sleeping at night, do you remember where your mom and Bikie slept?

[VICTIM]: In their bed.

[PROSECUTOR]: And you said that things were okay until you were doing it.  What does doing it mean?  Can you tell us what that means for you?

[VICTIM]: Sex.

[PROSECUTOR]: All right.  And what is sex?  Do you know what that means?

[VICTIM]: Sex means when you're humping another boy and a girl.

[PROSECUTOR]: Okay. And you said that you would do it with Bikie.

[VICTIM]: Yes.

[PROSECUTOR]: All right.  [W]hen you had sex with Bikie, I'm going to show you again the [anatomically correct diagrams].  Remember, do you remember if anything on Bikie would touch any part of you?

[VICTIM]: His penis.

[PROSECUTOR]: Okay. Right here.

[VICTIM]: Yeah.

[PROSECUTOR]: And where would that touch?

[VICTIM]: To my vagina.

[PROSECUTOR]: To your vagina?  And do you remember if it would go into your vagina?

[VICTIM]: Yes.

Jazmyne stated that she and Coates had intercourse in the basement of "the house," as well as the two bathrooms, her room, and her mother's room. She also supplied details regarding sexual positions, condoms, anal intercourse, and claimed that Coates "put his penis in [her] mouth." Further, Jazmyne claimed that Coates took her to his job at the Lake Forest Mall, where he would "take me into the bathroom and start doing it."

The following colloquy as to the timing of the alleged abuse is also relevant:

[PROSECUTOR]: ... [D]o you remember how old you were when you and Bikie would do it?

[VICTIM]: No.

[PROSECUTOR]: Do you remember how many times you and Bikie would do it?

[VICTIM]: Like a million times.

[PROSECUTOR]: ... Do you remember what grade you were in when Bikie did it to you?

[VICTIM]: Second.

[Prosecutor]: Okay. Do you remember what time of year it was it happened that you and Bikie were doing it?

[VICTIM]: No.

In addition, Jazmyne stated that she and Carl Edmonds had sex "[j]ust one time." Afterwards, she recalled that her "underpants were bleeding" and that she "tried to wash it so [her] grandmother wouldn't get mad." With regard to Lee, Jazmyne stated that he "would try to do the same thing like Bikie. He'd wake me up and then take me in, I think that was his room, and start humping me." When asked how many times Lee "hump[ed]" her, Jazmyne responded: "Just like one time." She recalled that the incidents with Lee and Edmonds occurred after Coates had abused her.

Jenkins testified that she and appellant were romantically involved from approximately the Spring of 1999 until September 2002. During much of that time, Coates lived with Jenkins and Jazmyne, who was then between the ages of three

and six. Jenkins often worked long hours and attended night school. As a result, Jenkins relied on others to help care for Jazmyne. Coates; Lakisha Casey, Jenkins's friend; and Tina and Carl Edmonds, Jenkins's mother and step-father, were among those who helped attend to Jazmyne. Jenkins characterized Jazmyne's relationship with Coates as "[v]ery close."

Jenkins recalled that on one occasion she noticed blood in Jazmyne's underwear, and took her to the doctor.[9] She was informed that the bleeding was due to a yeast infection that Jazmyne had scratched. Another doctor found that Jazmyne had a urinary tract infection. Neither doctor raised any concerns about abuse, however.

After Coates's relationship with Jenkins ended in September 2002, Jenkins began a relationship with Melvin Martin, who moved in with Jenkins and Jazmyne. Martin's son, Lorenzo, also spent time at Jenkins's home. Lorenzo was six years old in November of 2003.

According to Jenkins, in the Fall of 2003 (i.e., about one year after the end of Jenkins's relationship with Coates), Jazmyne began to exhibit strange behavior. She recalled that, while in the tub, Jazmyne would "sit on the soap or run the hot water on her body and just [sic] mannerisms that didn't seem normal for her." In addition, Jazmyne would put the back of her heel near her vagina and she "would just wiggle her ankle." Jenkins also observed Jazmyne insert the leg of a Barbie doll into her vagina. According to Jenkins, Martin once found Lorenzo naked in the basement with Jazmyne.

In November 2003, Jazmyne asked Jenkins: "[C]an little kids have babies?"[10] Jenkins responded: "No. Because if

---

9. Jenkins did not specify the date of the doctor visits, other than to say they were prior to her daughter's disclosure of abuse in the Fall of 2003. Bresee's notes reflect that, based on the medical history provided by Jenkins, the doctors' visits occurred in 2002.

10. Although Jenkins testified that the child's disclosure occurred in November 2003, a police report indicates that the authorities were made aware of the accusations on October 24, 2003.

they do, they'll die." At that point, Jazmyne began to scream but Jenkins "didn't know exactly what was wrong with her," so she "just held her." Jenkins claimed that Jazmyne then revealed that "she had sex with Bikie." In particular, Jazmyne said that Coates "put [his] dingy inside of her coochie." Jenkins continued: "And I looked at her and I was like when? And she just said, when he was here. I said, well, why didn't you tell me? And she said she was scared and she didn't want to." Jazmyne also told her mother that Lee had abused her. About a month later, she told her mother about Edmonds.[11]

After the initial disclosures, Jenkins did not immediately take Jazmyne to the hospital or to the police. She explained that she thought she "could find [Coates] on [ her] own." [12]

Bresee, a Sexual Assault Forensic Examination ("SAFE") nurse and a pediatric nurse practitioner, testified, without objection, as an expert in "the medical assessment and treatment of child sexual abuse and assault and sexual assault forensic examinations." On November 14, 2003, about three weeks after Jazmyne was interviewed by CPS and the police, Ms. Jenkins took Jazmyne to the Shady Grove Adventist Hospital, where the child was seen by Bresee.[13]

At the outset, Bresee explained the technique she uses when interviewing children:

> When I first meet the child, typically they're with a parent or a guardian and it's very important for me to establish a rapport so they're comfortable with me, so they are able to give a medical, you know, disclosure to me as to their reason for coming to see me so I can make sure they get appropriate medical treatment. And so usually I'll engage them in conversation, where do you go to school,

---

11. Jenkins suggested that Jazmyne did not initially disclose Edmonds's conduct because he w as present that day.

12. By the time of appellant's trial, Edmonds had passed away. In his brief, Coates claims that the authorities were unable to locate Lee.

13. Bresee testified that CPS scheduled the appointment with her. CPS then notified Jenkins of the time, date, and location of the appointment.

what types of things do you do for fun, . . . what do you do for the summer, do you go to camp, do you like to swim, and typically that really gets a child talking. And . . . sometimes I'll sit on the floor and we'll play with . . . some of the toys I have in the office and that's how I work on establishing a rapport with the child.

Bresee recalled that she saw Jazmyne and her mother in her office, "which also serves as an examination . . . area." As to her examination of Jazmyne, Bresee stated:

Ms. Jasmine T. presented with her mother, Kimberly Jenkins. . . . I [told] both Jasmine and her mother, Kimberly, that I need to get some basic information on where she lives, who she lives with, things she does for fun, her medical history, and also go through what we call a "review of symptoms" and that's looking to see if she has any . . . stomachaches or earaches or any complaints of illness. . . .

Bresee added that this step is necessary to determine whether the victim is "complaining of anything that would warrant . . . medical assessment and treatment." Claiming that the treatment plan is tailored to the specific needs of the child, Bresee illustrated by explaining that if Jazmyne had said she was having pain with urination, Bresee would have ordered an urinalysis.

Bresee explained to Jenkins that "it's very important that I hear from [Jazmyne] why she's [here] to see me." After Bresee gathered the background information, she spoke with Jazmyne alone.[14] Bresee showed Jazmyne diagrams of the human body to determine the names the child used for various body parts. The following exchange is relevant:

[PROSECUTOR]: Do you ever discuss with the child the difference between the truth and a lie?

[BRESEE]: Yes, I do.

---

14. In its brief, the State characterized the interview as a "medical forensic interview."

[PROSECUTOR]: And can you please explain to the ladies and gentlemen of the jury (a) why that is important and (b) how you go about doing that?

[BRESEE]: Sure ... first off, it's important for me to establish that they can ... identify the differences between the truth and a lie. And I stress-once I have established that they are able to tell me the difference between the truth and a lie, and in this case I asked Jasmine if she could tell me, you know, I have a VW, a Barbie VW bug that's bright red, and I would ask her, ... "If I said that VW bug is blue, is that the truth or a lie?" and she would say, "That's a lie." "If I said that VW bug is red, would that be the truth or a lie?" And she said "The truth." So, she was able to distinguish between a truth and a lie.

Then I just stress the importance of them telling the truth, that what they're here to see me for is medical assessment and treatment and it's very important that I know as many of the details, as they can recall, as to what happened to them that brought them to see me, so then I can make appropriate medical interventions and treatment plans accordingly.

The defense objected when the State moved to introduce the medical record of Jazmyne's examination.[15] At a bench conference, the following exchange occurred:

[DEFENSE COUNSEL]: I object to the whole record, I object to the interview for two reasons. One of the reasons is that I understand she is going to admit it for, under the exception of her medical diagnosis and treatment. Therefore, the fact that she names people who did it is irrelevant

---

15. Bresee's typed notes of the conversation, included in the medical record, contain an abbreviated version of what occurred. In Coates's view, it is salient that the notes did not say that Bresee told "Jazmyne her statements would be used to provide treatment." In relevant part, Bresee's notes state:

**Truth v. Lie:** Able to correctly state truth vs. lie when asked color of Barbie VW Bug. Agreed to tell only the truth.

Jazmyne also made statements about sexual abuse by "Jamal" and "Carl," but those statements are not relevant here.

for purposes of medical diagnosis and treatment. That is reason number one.

Reason number two is I think it is a violation of *Crawford [v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] because clearly these, when these interviews are done, there is a dual purpose and I think that was conceded by the State, that it is testimonial and that it violates *Crawford* because it is testimonial, they intend to use it at trial, and I think Jasmine recognized that because she asked Heidi if they were going to "go out and get them" or "Are they going to jail?" And we didn't, obviously, didn't have an opportunity to cross-examine her at the time that she gave the statement. So, for those two reasons, I object to the interview notes.

[PROSECUTOR]: Your Honor, I believe that (a) they are made in, the statements are made in pursuant to a medical diagnosis; that actually naming the person is important, especially for this particular type of medical diagnosis, to determine whether the exposure to any sexually transmitted diseases or to anything of those natures. So, the whole thing becomes relevant to the appropriate medical diagnosis, which the nurse practitioner was trying to formulate at that time.

In reference to *Crawford,* Jasmine testified. I mean, she has been here. The opportunity of confrontation has been provided in terms of what she said here, and so I just don't, I don't think we reach *Crawford.*

[DEFENSE COUNSEL]: I think that is a misreading of *Crawford.* I think all of the cases clearly state it is an opportunity to cross-examine at the time the statement is made.

THE COURT: I still think this is an unresolved issue, but I am informed that it has been resolved and that, as long as a child testifies . . . is not a basis to exclude. But they are being offered under a different explanation of the hearsay rule anyway, which is for medical treatment. The only question I have is, I haven't looked at them to determine if

anything would need to be redacted, but in general, I think they are going to be admissible.

The court then determined that, before the medical records would be published to the jury, counsel and the court would go through the records for possible redaction of identifying names. At the conclusion of the State's case, the clerk of the court, outside the presence of the jury, asked the judge whether to redact any portion of Bresee's notes. The judge responded in the negative. Defense counsel renewed her objection. After closing arguments, defense counsel once again reminded the court of her objection to Bresee's notes. The notes were admitted, without redaction.

The medical record does not reflect that Bresee personally administered any medical tests or collected any lab samples. It indicates that Ms. Jenkins reported that Jazmyne suffered from vaginitis and urethritis/epididymitis in 2002. Moreover, it reflects that Jazmyne reported that she had experienced abdominal/pelvic pain, and pain while urinating, as well as vaginal bleeding that she attributed to Edmonds's conduct.

When the State resumed its examination of Bresee, she reported that she told Jazmyne that she is "a special nurse who works with kids who might have been touched in a way that hurt or bothered them." Bresee asked Jazmyne "if something like that had happened" to her. According to Bresee, Jazmyne answered in the affirmative. Bresee continued:

> And I asked if she could tell me about that, and her response was, "Well, the first one was Bikey (phonetic sp.). He was my mother's ex-boyfriend. He put his private inside my private." I asked, "How many times did he do that to you?" and her response was, "A lot of times." I asked, "Do you remember when this happened?" and she said, "A long time ago." I asked, "Do you remember how old you were?" and she said "No."
>
> I asked her if Bikey had made her do anything else, and she said, "Yes. He made me lick his private, and he would lick my private too." I asked if she ever saw anything come

out of his private, and she said, "Yes, white stuff." And then I asked her if Bikey had, "Did Bikey tell you not to tell anyone?" and she said, "Yes. He told me not to tell my mommy. He told me if I would let him do it to me, then I could go see my mommy and he would also let me smoke a cigarette."

I asked, "You smoked a cigarette?" because it kind of took me off guard, and she responded, "Yes. Bikey gave it to me after he put his private in me."

At that point, defense counsel noted a continuing objection to Bresee's testimony as to the contents of her interview with Jazmyne. The following exchange ensued:

[DEFENSE COUNSEL]: Your Honor, I just want to clarify something for the record. I am not interrupting and objecting to each and every sentence here, but I do have an objection as I stated at the bench.

THE COURT: A continuing objection—

[PROSECUTOR]: A continuing objection.

THE COURT:—to the contents of the interview. Thank you.

Bresee continued:

I asked her, "Do you remember if it hurt when he did that?" and she said, "Yes. It hurt a lot. I cried." I asked her if she ever remembered seeing blood. She said, "Only when Carl [16] put his fingers inside me. That made me bleed." So, I asked her to finish talking about [Coates] before she told me about anything else, and she agreed. And I asked, "Is there anything else about [Coates] I should know?" and she said, "Yes. He did it to my friend Eomy," and then she spelled her friend's name, E–O–M–Y. "He touched her butt, but she won't tell her mommy . . . Eomy will talk to me and her friends about it, but she doesn't want to talk to her mommy about it."

And I asked at that point if she, if Jasmine had told Ms. Karen Vasserman, the CPS worker, about her friend Eomy,

---

**16.** Jazmyne identified Carl as her "grandma's boyfriend."

and she said, "Yes." And then I asked specifically if [Coates] had ever shown her pictures of people without their clothes on, and she said, "Yes. He showed me pictures in magazines and a movie on TV." And then I asked if there was anything else about [Coates] I should know, and she asked me, "Are you going to go out and find him now?" and I responded, "No, but Detective Buckley is working hard to find him."

The following colloquy is also relevant:

[PROSECUTOR]: Do you have training in terms of age-appropriate language, determining whether a child is using vocabulary that is appropriate to their age? Are you ever taught that in the interviewing techniques?

[BRESEE]: That's part of the Cornerhouse technique, [its] age-appropriate interviewing and asking questions that the child is going to understand.

[PROSECUTOR]: In terms of evaluating what Jasmine [sic] said to you, was she using age-appropriate language? In terms of her age and how she was speaking to you, what did you think about what she was telling you?

[BRESEE]: For a 7–year–old, it was, to me, it's not appropriate for a 7–year–old to describe licking private parts or fingers in their vagina. In the context of what I do, it's age-appropriate.

[PROSECUTOR]: In terms of the details that she provided you, why were the type of details she provided you significant?

[BRESEE]: They were personal in nature to her. She was able to recount the pain, which is a personal experience, that if you—you can't really describe pain unless you've experienced pain. She also was able to describe white stuff coming out of a private part, which is, you know, beyond her knowledge, should be beyond her knowledge of a 7–year–old, and the acts that she was describing were personal to her.

[PROSECUTOR]: In the Cornerhouse technique, training of interviewing, is part of that, are you taught to determine

or try to determine when the child is telling you about a fantasy versus reality?

[BRESEE]: It is discussed, yes.

[PROSECUTOR]: And what were some of the techniques you were taught to make this determination?

[BRESEE]: Basically to get, to establish the truth versus lie, to understand that we are talking about the here and now in that, you know, I only want her to tell me what she recalls actually happening to her and then what's personal in nature as, again, pain, bleeding, different types of things that had happened to her. The cigarette was very personal to her. She remembered it happening.

Following her conversation with Jazmyne, which lasted about forty-five minutes, Bresee conducted a "head-to-toe physical assessment." Bresee explained:

[W]e start with height and weight, vital signs, which are temperature, blood pressure, pulse, respiratory rate, and then I start by doing an assessment, head-to-toe, looking in their eyes, ears, nose, mouth, working down, their chest, their breast, you know. I look at their skin and, you know, feel their scalp as I'm working down, and I go all the way down to the toes minus the genitals.

The exam of the private parts in this case is the last part I do. . . .

Bresee testified that she explained to Jazmyne the nature of a pelvic examination, including the use of a MedScope camera for light and magnification. No anal injuries were found. But, upon examination of the child's vagina, Bresee observed "physical signs that were suggestive of a sexual nature. . . ." She explained: "[T]he edges of the hymen for a 7–year–old should be very crisp and sharp . . . almost translucent in appearance. With [Jazmyne], what I saw [was] very dull, rounded edges, with a very narrow hymen. . . ."

In Bresee's view, the condition of Jazmyne's hymen was indicative of repetitive, penetrating trauma, rather than a one-time incident, such as insertion of an object (e.g., a toy), or a straddle injury. According to Bresee, the clinical findings,

coupled with the child's disclosures, were "very highly suggestive of sexual abuse." [17] Bresee also opined that there was "probable abuse." [18]

At the conclusion of the examination, Bresee provided Jenkins with a form entitled "Pediatric Discharge Instructions," which recommended follow up care as needed, as well as testing for "STD–HIV," [19] including the phone number for a local clinic. The form also said: "Counseling is recommended for any victim of sexual abuse or assault," and included the handwritten name and phone number of the person to contact for the initial assessment and screening. Bresee also provided her office voice number if Jenkins had any questions or concerns.

Ann Hoffman, a social worker, testified for the State as an expert in Child Sexual Abuse Accommodation Syndrome. Hoffman stated that abused children often delay disclosing extended abuse, and typically do so a "bit at a time." She added that children who are abused at a young age tend to display heightened sexualized behaviors, and often bond with the abuser. Hoffman also described the process of "grooming," in which an abuser gains a child's trust through special attentiveness. When asked how accurate a child who has suffered sexual abuse may be in recounting the exact number of times of abuse, Hoffman replied that "it's difficult … for children to enumerate … and it's difficult [for them] to

---

17. On cross-examination, Bresee indicated that she could not pinpoint when the trauma to the hymen had occurred. She opined that it was at least five days prior to her examination of Jazmyne.

18. The term "probable abuse" is one of four levels used in a nationally recognized classification system for child sexual abuse. Class 1 refers to no indication of abuse; Class 2 refers to possible abuse; Class 3 is probable abuse; and Class 4 is definite evidence of abuse or sexual contact, such as a confirmed pregnancy in which the perpetrator's DNA matches that of the baby.

19. Jazmyne had not yet been diagnosed with an STD when she was seen by Bresse. According to the State, when the child was examined in March 2004, she was diagnosed with genital herpes. In particular, the State asserts that Jazmyne tested positive for Herpes AB–Type 2.

608

remember the specific details of any one incident." Moreover, she testified that many children display a flat affect in describing the abuse.

Following Hoffman's testimony, the State rested. No witnesses were called for the defense. In its instructions to the jury, the court stated, in part:

As jurors, you are the sole judges of whether a witness should be believed. In making this decision, you can apply your own common sense and everyday experiences. In determining whether a witness should be believed, you should carefully judge all of the testimony and evidence and the circumstances under which each witness has testified.

You should consider such factors as the following: the witness' behavior on the stand and manner of testifying, did the witness appear to be telling the truth, the witness' opportunity to see or hear the things about which testimony was given, the accuracy of the witness' memory, does the witness have a motive not to tell the truth, does the witness have an interest in the outcome of the case, was the witness' testimony consistent, was the witness' testimony supported or contradicted by evidence that you believe, and whether and the extent to which the witness' testimony in court differed from the statements made by the witness on any previous occasion. You need not believe any witness, even if the testimony is uncontradicted. So, you may believe all, part, or none of the testimony of any witness in the case.

· An expert is a witness who has special training or experience in a given field. You should give expert testimony the weight and value that you believe it should have. You are not required to accept any expert's opinion. You should consider the expert's opinion together with all of the other evidence. In weighing the opinion of an expert, you should consider the expert's experience, training and skills, as well as the expert's knowledge of the subject matter about which the expert is expressing an opinion. Now, in this case, there were two expert witnesses, and as to Ann Hoffman's expert testimony, it is not to be taken as a confirmation of Jasmine T.' [s] credibility or that abuse in fact occurred.

\* \* \*

You have heard testimony that Jasmine T. made a statement before trial. Testimony concerning that statement was permitted only to help you decide whether to believe the testimony that the witness gave during the trial. It is for you to decide whether to believe the trial testimony of Jasmine T. in whole or in part, but you may not use the earlier statement for any purpose other than to assist you in making that decision.[20]

In closing argument, the State argued, in part:

Jasmine's word alone, if you find beyond a reasonable doubt, of her word alone, is enough evidence to convict the defendant. And you must decide that credibility based on her demeanor to you, on prior statement[s], hear [sic] the statements to Ms. Bresee in the medical records, which are going to go back to you, in which Jasmine talked about what [Coates] did to her. She said, "Well, the first one was [Coates]. He was my mom's ex-boyfriend. He put his private inside my private." Ms. Bresee asked, "How many times did he do that to you?" Jasmine says, "A lot of times." She talked about how he made her lick his private and that he would lick her private, too, and that she would see white stuff coming out of his private and how he would let her smoke cigarettes.

---

**20.** The court did not propound an instruction tailored to the use of Ms. Bresee's testimony about Jazmyne's pre-trial statements. We note that Ms. Bresee was not the only witness who related hearsay statements made by Jazmyne before trial. Therefore, the limiting instruction quoted above may have been given in reference to those other statements.

In any event, notwithstanding the court's limiting instruction concerning "a statement" made by Jazmyne before trial, both sides agree that the court admitted Jazmyne's statements to Ms. Bresee as substantive evidence under Rule 5–803(b) (i.e., the hearsay exception for statements made in contemplation of medical treatment). Given that the parties agree that the court relied on Rule 5–803(b) in admitting Bresee's testimony about Jazmyne's statements, we decline to analyze the admission of the child's statements to Ms. Bresee under Rule 5–616(c).

*You must determine accuracy. You can look at it to determine the credibility of Jasmine, her accuracy of her memory—again, consistent with what she told Ms. Bresee.* What is the interest in the outcome of this case? What are Jasmine's motives for making up that it was the defendant who did this to her? He is out of the house. He is no longer with mom. There has absolutely been no evidence as to show any motive or interest for Jasmine to say this other than for being the truth.

(Emphasis added.)

## DISCUSSION

### I.

Coates contends that the trial court erred and abused its discretion "by permitting the State to introduce Jazmyne's statements, through the testimony of Ms. Bresee, as substantive evidence under the medical treatment and diagnosis exception to the hearsay rule." Appellant mounts numerous arguments to support his position. He maintains that the State failed to satisfy the "foundational requirements of the exception," because the circumstances "demonstrated that Jazmyne was not seeking treatment when she spoke to Ms. Bresee," nor did the State "show Jazmyne thought Ms. Bresee would treat her in the future." Consequently, he maintains that the child's statements were not provided for a "medical purpose." Moreover, Coates complains that Bresee's testimony improperly and unfairly bolstered Jazmyne's credibility and usurped the jury's function. He argues: "Because the required guarantee of trustworthiness was not present, the trial court should not have admitted Jazmyne's statements."

Appellant considers "significant" the lapse of time between the alleged abuse and Bresee's examination of Jazmyne. According to Coates, "When the event giving rise to a potential injury is still recent, a child is more likely to understand the medical connection between the event and the physician's examination of her, and thus is also more likely to answer questions truthfully." He avers:

Ms. Bresee spoke with Jazmyne 14 months after the alleged abuse had ended, and Jazmyne exhibited no signs of injury or illness prior to the interview. A 14 month delay is far beyond that contemplated in cases that ruled in favor of admitting statements under the medical exception. Those cases consistently emphasize the close proximity of the statement to the alleged criminal act when upholding a trial court's decision to admit.

Appellant continues:

By the time Ms. Bresee interviewed Jazmyne, 14 months had elapsed since any alleged abuse by Mr. Coates had ended.... Even when Ms. Jenkins heard the allegations, she did not take her daughter to a hospital for 21 days.... She was more concerned with finding Mr. Coates than seeking treatment for Jazmyne. Nothing in Ms. Jenkins' testimony suggested she thought Jazmyne needed medical treatment after she learned she was abused. Nor did Ms. Bresee's notes mention any complaints. In fact, Ms. Jenkins took Jazmyne to Ms. Bresee only because Ms. Bresee had been assigned to the case by CPS....

Furthermore, looking to "the content" of the interview, appellant insists that it "demonstrated that the declarant did not perceive a medical purpose" for the examination, and showed that the child did not provide her statements in connection with medical treatment. To the contrary, argues Coates, Jazmyne's statements reflected that her motivation in speaking to Bresee "stemmed from her desire to apprehend Mr. Coates, not a need for treatment." According to appellant, "the most direct evidence of Jazmyne's state of mind" was apparent when Bresee asked Jazmyne if "there was anything else she should know about Mr. Coates" and Jazmyne responded: " 'Are you going to go out and find him now?' "

Coates also complains that Bresee's questions "focused on gaining information about Mr. Coates, not Jazmyne's medical condition." He explains:

Ms. Bresee's message [to Jazmyne] did not convey that she medically treats children, only that she "works with" them.... Throughout her interview with Jazmyne, Ms. Bresee focused on physical symptoms that had long ago disappeared. This is why, despite hearing that Jazmyne experienced bleeding and burning urination after Mr. Edmonds abused her, Ms. Bresee ordered collected no blood or urine samples, and performed no lab tests.... Instead, Ms. Bresee asked investigative questions irrelevant to future treatment, which indicated to Jazmyne the interview was not about her physical well being[.]

Based on what transpired during the interview, appellant asserts that Jazmyne "did not arrive in Ms. Bresee's office seeking medical treatment, and Ms. Bresee's questions did not change her state of mind. Instead, Ms. Bresee's questions conveyed to Jazmyne that she was part of the prosecution team." Appellant elaborates:

The fact that Jazmyne felt it necessary to provide additional evidence against Mr. Coates, including the actual spelling of her friend's name, demonstrates Jazmyne's state of mind was not that of a patient. She was not seeking medical help. Despite the irrelevance of this information to medical treatment, Ms. Bresee pressed on, imputing to Jazmyne the importance of conveying this information to authorities and, in doing so, implicitly identifying herself with the investigation[.]

Appellant also contends that Bresee "invaded the jury's role as factfinder," because her testimony encroached on "the jury's function to determine credibility, and virtually dictated the outcome of the case." Given Bresee's status as an expert, coupled with the inclination of juries "to defer to the opinions of witnesses who are 'clothed by the court with the mantle of an expert,'" Coates complains that he was "seriously prejudiced" by Bresee's testimony. Noting that "[t]he State's case turned on whether the jury believed Jazmyne's allegations against Mr. Coates," he posits that Bresee unfairly bolstered Jazmyne's testimony and "add[ed] details she omitted during trial." Coates argues:

Jazmyne's testimony was vulnerable to begin with. She did not report any sexual abuse until more than a year after Mr. Coates left the home.... By the time she testified at trial, she had talked to a myriad of adults, including police, child protective service workers, social workers, therapists, and relatives, ... who could have shaped her recollections. She contradicted herself during testimony when she admitted, ... and then denied, ... seeing Ms. Casey's son Lorenzo's penis, and when she admitted, ... and then denied, that he witnessed some of the abuse. She could not remember times, dates, or how old she was when certain events occurred.... Under these circumstances, Ms. Bresee's endorsement of Jazmyne's testimony was critical to the State's case. Indeed, the prosecutor relied on Ms. Bresee's testimony during closing argument.

According to appellant, it is clear that the jury had doubts about Jazmyne's credibility because it was unable to reach a verdict on two counts and, notably, those were the only counts in which the salient "parts of Jazmyne's story ... were not repeated by Ms. Bresee." In Coates's view, this "strongly suggests that the jury was swayed by Ms. Bresee's improper bolstering." In the absence of Bresee's testimony, argues appellant, "it is possible that the jury would have acquitted Mr. Coates of all charges."

He continues:

Ms. Bresee was, in essence, impermissibly acting as a human polygraph machine.[ ] ... The State's question about the "Cornerhouse technique" and its utility for making a "determination" that a child knows her memories are not fantasy demonstrated this.... Just as a polygraph might measure a person's heart rate to determine their truthfulness, Ms. Bresee, as human lie detector, relied upon things that were "personal in nature." This was particularly damaging because, in providing examples of "personal" memories that were specific to Mr. Coates, like the cigarette, ... Ms. Bresee not only testified that Jazmyne was credible when she said abuse had occurred, but also that she was credible in describing who did it.

In addition, Coates contends that the improper bolstering of the child's credibility with her prior hearsay statements to Bresee cannot be harmless beyond a reasonable doubt. Appellant underscores that the "critical issue" of who sexually abused Jazmyne "was not resolved by Ms. Bresee's physical findings." Coates argues: "Unless the jury believed Jazmyne's trial testimony was accurate, it had no basis to find Mr. Coates guilty." Appellant adds: "Given the reliability problems with Jazmyne's testimony, Ms. Bresee's stamp of approval could easily have tipped the verdict."

The State counters that Jazmyne's statements to Bresee were both "given and taken in contemplation of medical treatment or medical diagnosis for treatment purposes," and met the requirements for the medical purpose exception to the hearsay rule. Therefore, argues the State, they were properly admitted as substantive evidence.

According to the State, there was a "plethora of circumstantial evidence" indicating that Jazmyne knew the purpose of her meeting with Bresee. For example, the child's

statements were taken in a hospital setting; the interview was conducted by a registered and presumably uniformed nurse; and there were other medical procedures performed, such as taking Jasmine's temperature, checking her pulse and blood pressure, determining her height and weight, and looking at different body parts, as might normally occur in a routine checkup.

Moreover, the State maintains that Jazmyne's question to Bresee "about whether she was going to find Coates does not negate that Jasmine understood the medical purpose for the examination." It also urges us to reject Coates's argument "that the victim was not seeking medical treatment [merely] because she had no known active injury . . . ." In this regard, the State points out that an important reason for an examination of a sexual assault victim is to determine whether the victim has contracted any sexually transmitted diseases.

With regard to Coates's claim that Bresee improperly addressed the veracity of Jazmyne's testimony, the State asserts

that Coates never objected at trial on this basis. Even if preserved, the State claims that the "trial court properly exercised its discretion regarding the scope of [Bresee's] expert testimony." Finally, the State argues that, even if Bresee's testimony was erroneously admitted, it was harmless error because it was "cumulative to other properly admitted evidence."

## II.

■■■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). As a general rule, hearsay is not admissible at trial. Md. Rule 5–802. "A hearsay statement may be admissible, however, under an exception to the hearsay rule because circumstances provide the 'requisite indicia of trustworthiness concerning the truthfulness of the statement.' " *State v. Harrell,* 348 Md. 69, 76, 702 A.2d 723 (1997) (quoting *Ali v. State,* 314 Md. 295, 304–05, 550 A.2d 925 (1988)).

The exception upon which the State relies is set forth in Maryland Rule 5–803(b)(4). It states, in pertinent part:

**Rule 5–803. Hearsay exceptions: Unavailability of declarant not required.**

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(b) Other exceptions.

\* \* \*

(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

Professor McLain explains: "The circumstantial guarantee of sincerity is present only when the declarant seeks treatment, or diagnosis in order to determine whether treatment is necessary." McLain, MARYLAND EVIDENCE, § 803(4), at 219 (2001) ("Maryland Evidence"). Similarly, we have said: "The rationale behind this exception is that the patient's statements are apt to be sincere and reliable because the patient knows that the quality and success of the treatment depends upon the accuracy of the information presented to the physician." *In re Rachel T.,* 77 Md.App. 20, 33, 549 A.2d 27 (1988); *see Webster v. State,* 151 Md.App. 527, 536, 827 A.2d 910 (2003); *Low v. State,* 119 Md.App. 413, 418–19, 705 A.2d 67, *cert. denied,* 350 Md. 278, 711 A.2d 870 (1998).

The hearsay exception " 'extends to statements made in seeking medical treatment from others such as nurses[.]' " *Choi v. State,* 134 Md.App. 311, 321, 759 A.2d 1156 (2000) (citation omitted). The exception, however, does not apply to statements made to nontreating medical personnel. *See Maryland Dep't of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 589–90, 565 A.2d 1015 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990). Speaking for this Court in *Webster,* 151 Md.App. 527, 827 A.2d 910, Judge Adkins elaborated on the exception, *id.* at 536–37, 827 A.2d 910 (italics added):

> The exception specifically contemplates the admission of statements describing how the patient incurred the injury for which he is seeking medical care. For example, "if the doctor needed to know the source of the injury in order to determine treatment ..., the patient's statement as to source should be admissible, particularly if the doctor told the patient that the information was necessary for proper treatment." 6A Lynn McClain [sic], *Maryland Evidence* § 803(4):1, at 218 (2d ed. 2001) (collecting cases).
>
> \* \* \*
>
> But the "need to know" premise for the exception means that it does not extend to statements made to nontreating medical personnel. In *Maryland Dep't of Human Re-*

*sources v. Bo Peep Day Nursery,* 317 Md. 573, 589, 565 A.2d 1015 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990), the Court of Appeals explained why *statements made to treating medical personnel fit within this exception, but those made to medical providers who merely examine a sexual assault victim do not.* "Under the law of evidence, as a general proposition, statements of medical history, made by a patient to a treating medical practitioner for the purpose of treatment, may be admitted as substantive evidence through the medical witness." Id. at 589, 565 A.2d 1015 (citations omitted). "Consequently, statements made to a nontreating physician, such as an expert preparing for an upcoming trial, are not admissible as substantive evidence[.]"[2] *In re Rachel T.,* 77 Md.App. at 34, 549 A.2d 27.

*For this reason, courts must separately examine both the reason that a medical provider asked the sexual assault victim to describe the assault, and the victim's subjective purpose in making the statement. See id.* at 33–34, 549 A.2d 27. *Only statements that are both **taken and given** in contemplation of medical treatment or medical diagnosis for treatment purposes fit within the Rule 5–803(b)(4) hearsay exception. See id.; Cassidy v. State,* 74 Md.App. 1, 27–50, 536 A.2d 666, *cert. denied,* 312 Md. 602, 541 A.2d 965 (1988).

---

[FN2]. But a doctor who examines a patient in order to qualify as an expert witness can testify about "information ... received from the patient which provide[s] the basis for the conclusions" about which he testifies. *Beahm v. Shortall,* 279 Md. 321, 327, 368 A.2d 1005 (1977). The conclusions are "admissible as substantive evidence." *Id.* The statements to the physician "are admissible, with a qualifying charge to the jury, only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements." *Id. See Cassidy v. State,* 74 Md.App. 1, 43, 536 A.2d 666, *cert. denied,* 312 Md. 602, 541 A.2d 965 (1988).

We pause to explore the relevant cases that frame our analysis. We begin with *Cassidy v. State,* 74 Md.App. 1, 536 A.2d 666 (1988), which involved a two-year-old child who was brought to a hospital by Child Protective Services as the result of physical abuse. The physician observed numerous bruises on the arms, legs, and buttocks of the victim, and also

noted signs of irritation to the genital area. During the examination, the physician asked approximately five times, " 'Who did this?' ", and on each occasion the victim answered, " 'Daddy.' " *Id.* at 6, 536 A.2d 666. When asked about the two-year-old's understanding of the purpose of his questioning, the physician replied: " 'I don't know what her understanding of the situation was.' " *Id.* at 29, 536 A.2d 666. Upon further inquiry, he stated: " 'I don't believe that a two-year-old is capable of understanding a concept like why somebody is asking questions.' " *Id.*

Writing for this Court, Judge Moylan determined that the child's statements did not satisfy the common law exception for statements to treating doctors, and therefore the trial court erred in allowing the treating physician to repeat the incriminating statements at the father's trial on charges of child abuse and assault. The Court reasoned that the victim lacked "the concerned physical self-interest," nor did she "understand the nature or the purpose of her interview" with the treating physician. *Id.* at 30, 536 A.2d 666. Because such knowledge lies "at the very core of this particular evidentiary theory," said the Court, the victim's statements to the physician, implicating her father, were inadmissible under this theory. *Id.*

In *In re Rachel T., supra,* 77 Md.App. 20, 549 A.2d 27, decided the same year as *Cassidy,* the Court considered whether the statements by a four-year-old sexual assault victim to health care professionals were admissible at a Child In Need of Assistance hearing at which the victim did not testify. The Court reached a different result from the one in *Cassidy.*

Rachel was examined by her pediatrician after blood was found on her panties and in the toilet. Upon examination, the pediatrician suspected sexual abuse. Rachel was seen at a rape center the following day. The pediatric gynecologist arranged for a female social worker on his staff to take Rachel's medical history, "in accordance with his usual procedure. ..." *Id.* at 25, 536 A.2d 666. When asked about the

source of the bleeding, Rachel disclosed to the social worker that " she had a secret with her Dad and that if she told her Mom her father would be in big trouble.' " *Id.* The history was included in the medical record. *Id.* The physician's subsequent physical exam indicated "on-going sexual abuse." *Id.*

Thereafter, Rachel and her family were referred to a clinical psychologist specializing in sexual abuse. During their first session, Rachel depicted intercourse with anatomically correct dolls. When asked whether she had ever seen a penis, she responded that she had seen her father's. She also told the psychologist that, on two occasions, her father had put his penis in her, and that it hurt.

Based on *Cassidy*, the circuit court excluded Rachel's statements to the social worker on the pediatric gynecologist's staff, and to the clinical psychologist. On appeal by the Department of Social Services and the child, this Court reversed. We concluded that Rachel's statements were part of the medical history obtained by the social worker and relied upon by the treating physician, and were therefore admissible as substantive evidence. *Id.* at 34–36, 536 A.2d 666. Notably, we reasoned, *id.* at 35, 536 A.2d 666 (emphasis added):

> When the social worker met with Rachel, she explained to Rachel that the reason for Dr. Doran's examination and questions were "because we were worried and wanted to see why there had been blood in her panties and in the toilet." Thus, Rachel knew that her statements would be used to provide appropriate treatment. Additionally, the persistent bleeding probably affected Rachel-the universally frightening nature of unexplained blood would have disturbed her and made her apt to tell the truth in order to become better. *Granted, by the time Rachel saw Dr. Doran, the bleeding had stopped, but it was recent enough to retain its sobering character.*

The Court continued, *id.* at 35–36, 536 A.2d 666:

> Important to our decision in *Cassidy* was that the identity of the child's 31 abuser was not related to medical treat-

ment. In *Cassidy*, the evidence of abuse was primarily external—the child was bruised on the arms, legs, and buttocks. We noted in *Cassidy*, however, that "[w]hen there is a danger that an assault victim may have contracted a communicable disease, of course, the identity of the assailant may take on significant medical pertinence." *Cassidy*, 74 Md.App. at 34 n. 14, 536 A.2d 666. Unlike the child in *Cassidy*, the evidence, including the blood and Rachel's abnormally dilated hymen, presented this potential danger. For example, it was possible that Rachel had been exposed to a venereal disease, and may have required antibiotics. Additionally, Rachel's parents suggested that her bleeding and dilated hymen may have been caused by some inanimate object such as a broomstick. If that had been the case, a tetanus shot might have been required. Dr. Doran testified that, although he had no specific recollection of seeing Rachel more than once, his usual practice is to have a child return for a follow-up visit, to see if other medically significant findings appear and to decide whether to recommend that the child be referred for psychiatric treatment. *Ascertaining the identity of the abuser was also important in the instant case because effective treatment might have required Rachel's removal from the home.* Dr. Doran, having tried unsuccessfully to elicit information himself from Rachel, asked his specially trained social worker to speak to Rachel. He testified that use of this interdisciplinary team method was common practice where a child was unwilling to talk to a doctor, and that he relied on the information in making his diagnosis and prescribing treatment.[21]

(Emphasis added.)

*Low v. State*, 119 Md.App. 413, 705 A.2d 67 (1998), on which appellant relies, is also instructive. There, the trial court

---

**21.** We also held that the trial court erred in striking from the clinical psychologist's testimony Rachel's statements about intercourse with her father, "as well as statements made ... via the dolls, which showed Rachel's unusual sexual precocity." *Id.* at 37, 536 A.2d 666. We noted

admitted the child sexual abuse victim's statement, concluding that it was made for both medical and forensic purposes. We reversed.

In that case, the victim was eleven years of age when she moved in with her brother-in-law and his wife following the death of the victim's father. When she was twelve, the victim disclosed that her brother-in-law had sexually abused her. She was examined by a pediatrician, who was an expert in child abuse.[22] A social worker had referred the victim to the physician for a complete medical evaluation, during which the physician performed a comprehensive review of the victim's health. During the course of the examination, the physician noted evidence of sexual trauma. After the initial examination, the doctor concluded that no medical treatment was necessary, and she never saw the victim again. The trial court found that these facts were sufficient to qualify the doctor as a "treating physician." The doctor testified at trial that the victim's vagina and anus showed evidence of trauma and penetration by a foreign object.

On appeal, we agreed with the appellant that the court erred in admitting various portions of the doctor's testimony, relating that the child said she was hurt when " 'the perpetrator' put his penis in her vagina and in her 'butt' more than ten times." *Id.* at 416, 705 A.2d 67. Speaking for the Court, the majority concluded that the doctor qualified, at best, as an "examining physician." *Id.* at 421, 705 A.2d 67. In our view, "the doctor's standard operating procedure of taking an oral history from the patient's parent, meeting with the patient, and asking the child patient if he or she knew why he or she was there [did] not in and of itself qualify her as a treating

---

that the testimony was not offered as substantive proof, but rather as the basis upon which the clinical psychologist based her expert opinion. The Court said: "We see little sense in allowing [the clinical psychologist's] opinion without the data which supports it." *Id.*

**22.** The opinion does not discuss the period of time when the abuse occurred; how or when it was discovered; or how much time elapsed between the discovery of the abuse and the date of the examination.

physician." *Id.* at 422, 705 A.2d 67. The Court continued, *id.* at 422–23, 705 A.2d 67:

> [The doctor] testified that after following the previous procedures she then "might say mom or dad is concerned about your health because of some unhappy experience that might have happened to you." There was, however, no evidence adduced at trial that [the victim] was in fact asked if she knew why she was there, or, even if asked, what [the victim's] reply might have been. In other words, [the doctor's] usual operating procedure, even if employed in relation to [the victim], did not give the impression of a doctor who would necessarily treat [the victim] on future occasions. In fact, when asked by defense counsel what her purpose was in conducting the examination of [the victim], [the doctor] replied only "[f]or complete medical evaluation." No mention was made by the doctor of potential treatment.

The Court also found that the doctor's willingness to provide future medical treatment, if needed and requested by the victim's mother, did not render the doctor a treating physician. *Id.* at 423, 705 A.2d 67. The Court was "not entirely convinced by the record that [the doctor] 'could have' provided such continuing treatment. . . ." *Id.* This conclusion was partly based on the contents of a discharge form prepared by the doctor and provided to the victim, on which check marks were placed next to "Your personal physician" and "Community Clinics" as sources of continuing treatment. The doctor did not supply her own contact information.

Moreover, the Court was not satisfied that child-declarant understood that the purpose of the examination was a medical one. The Court reasoned, *id.* at 424, 705 A.2d 67 (emphasis added):

> [E]ven assuming for the sake of argument that [the doctor] could have provided [the victim] with subsequent treatment, the subjective beliefs of the doctor as to what she could and would do are immaterial to the issue. The heart of the issue returns to the guarantee of trustworthiness emphasized in *Cassidy,* and, in order to maintain that trustworthi-

ness, *[the victim] must have contemplated the possibility of further treatment by the doctor.* The fact that [the doctor] thought she could give [the victim] follow-up treatment does not mean that [the victim] knew she could receive such follow-up treatment from the doctor, absent evidence that [the doctor] *communicated* those intentions to [the victim or the victim's] mother. And in the case at bar we have no such evidence before us. Additionally, *even if [the doctor] had rendered treatment, her doing so would have been incidental and secondary to her primary role as a forensic examiner.*

Nor did the Court agree with the trial court's determination that the doctor was both a treating physician as well as an examining physician, merely because the doctor gave the victim a complete physical examination in areas other than those affected by the alleged sexual abuse. The Court said, *id.* at 424–25, 705 A.2d 67:

The conclusion that we instead draw is that a child of twelve years,[5] who has never before been seen by a doctor (and will never again be seen by this doctor), who is poked at and prodded in virtually every area of her body, and who is asked a multitude of questions, some quite sensitive in nature, is most likely, at the very least, an extremely intimidated little girl, who has little grasp of why she was sent to this strange doctor in a strange setting. If anything, [the victim] had a right to be downright suspicious as to why the doctor was examining her in body areas other than those stemming from the complained of incident, and that, in our opinion, would have promoted [the victim's] distrust of and perhaps dishonesty with the doctor much more than it would have facilitated a relationship of trust.

---

[5]. Although [the victim] was significantly older than the child victim in *Cassidy,* given the facts in this case we do not believe that a twelve-year-old child any more than a two-year-old child would have assumed that [the doctor] was examining her for the purpose of subsequent treatment. The age discrepancy in the two cases presents no meaningful distinction for purposes of our analysis.

Accordingly, the Court's majority concluded that the doctor was not a treating physician. As a result, her testimony did not meet the requirements of Rule 5–803(b)(4).[23]

More recently, in *Webster,* 151 Md.App. 527, 827 A.2d 910, we considered the admissibility of statements made by a four-year-old sexual assault victim to a SAFE nurse. In that case, the victim's neighbor discovered Webster touching the victim's pants in the neighbor's bathroom. Notably, the neighbor *immediately* took the victim to her mother. Shortly thereafter, the police arrived and the victim was taken to the hospital, where a SAFE nurse interviewed the victim and performed a physical exam. At trial, Webster unsuccessfully challenged the admissibility of the victim's statements to the nurse. The trial court allowed the nurse to testify that the victim told her " 'that a man that she didn't know had licked her do-do and she told him not to and he said he was going to keep on doing it.' " *Id.* at 531, 827 A.2d 910.

On appeal, the Court ruled that the testimony was properly admitted as substantive evidence. The Court recognized that a statement made to a treating nurse for dual purposes—both medical and forensic—may fall within the Md. Rule 5–803(b)(4) hearsay exception. *Id.* at 545–47, 827 A.2d 910. The Court reasoned, *id.* at 545–46, 827 A.2d 910 (citation omitted):

> The rationale for admitting this type of hearsay—that statements in contemplation of medical diagnosis or treatment are inherently reliable—may still exist in such circumstances. If the challenged statement has some value in diagnosis or treatment, the patient would still have the requisite motive for providing the type of "sincere and

---

**23.** In his dissent, Judge Alpert cited evidence that the child was tested for sexually transmitted diseases and referred for mental health counseling. He concluded that the trial court did not err in permitting the doctor to testify as both an examining and treating physician. *Id.* at 436, 705 A.2d 67. Professor McLain criticizes the majority as having "misread Rule 5–803(b)(4), which does not require that treatment actually be provided." MARYLAND EVIDENCE, § 803(4), at 223. In her view, Judge Alpert "properly dissented." *Id.*

reliable" information that is important to that diagnosis and treatment.

That determination did not end our inquiry, however. We next reviewed the trial court's factual findings to ascertain whether the victim's statement "was both *taken and given* in contemplation of medical diagnosis or treatment. . . ." *Id.* at 548, 827 A.2d 910 (emphasis added).

Mr. Webster conceded that the SAFE nurse's examination was *taken* for medical diagnosis or treatment. This Court noted that the record indicated that the SAFE nurse "clearly articulated medical reasons for asking [the victim] what happened," because she testified that "a sexual assault victim may have internal injuries or may have contracted a venereal disease, even though she feels no pain and bears no external signs of injury during the brief initial physical examination for 'major medical problems.'" *Id.* at 548, 827 A.2d 910. Thus, the first prong of the inquiry was satisfied.

We next addressed Mr. Webster's challenge to the trial court's finding that the victim had a medical reason for *giving* a description of the assault. The appellant contrasted what the victim was told about the SAFE examination with what the four-year-old victim was told in *In re Rachel T.* According to Mr. Webster, there was "no comparable evidence that [the victim] was told about the medical reason for the examination and questions." *Id.* at 549, 827 A.2d 910.

The Court agreed with Webster that the record did not reflect that the SAFE nurse provided the victim with a medical explanation for the examination, but disagreed that "such an explicit statement is necessary in every case." *Id.* at 549–50, 827 A.2d 910. We stated: "Although telling a patient that the information she provides will help in diagnosis and treatment would support the admissibility of responsive statements, circumstantial evidence also may provide an adequate evidentiary foundation for admitting the statement." *Id.* at 550, 827 A.2d 910 (citation omitted). Therefore, we sought to determine whether "circumstantial evidence supported the trial court's conclusion that [the victim] understood the medi-

cal purpose for the examination and questions, and that she told [the SAFE nurse] what happened in contemplation of medical diagnosis and treatment." *Id.*

Upon review of the record, we concluded that it contained sufficient circumstantial evidence to indicate that the victim understood the medical reasons for the SAFE nurse's examination. Of import here, we noted that the victim was *"questioned in emergent circumstances, within a few hours of the assault,* in a hospital setting," and that "[t]he interview was conducted by a registered and presumably uniformed nurse." *Id.* at 551, 827 A.2d 910 (emphasis added). Moreover, the SAFE nurse's examination immediately followed a triage nurse's brief examination for blood pressure and pulse, and an examination by a emergency room doctor who physically assessed the child for major medical problems. We also pointed out that the SAFE nurse asked questions such as "what happened," instead of "who did this," which "was consistent with questions that nurses and doctors commonly ask even young children when they seek medical assessment and treatment." *Id.* at 552, 827 A.2d 910. Finally, we were satisfied that the victim "understood that there was a medical reason for truthfully telling [the SAFE nurse] what had been done to her." *Id.* at 552, 827 A.2d 910. Accordingly, we concluded that, under Md. Rule 5–803(b)(4), the trial court did not err in admitting the SAFE nurse's testimony as to the victim's statements.

In the case *sub judice,* Bresee testified that she explained to Jazmyne that she was there to see Bresee for "medical assessment and treatment." Bresee also told Jazmyne that it was "very important that I know as many of the details ... as to what happened," in order to "make appropriate medical interventions and treatment plans...." In the light most favorable to the State, Bresee had a valid medical reason for eliciting Jazmyne's account of the sexual assault; her questions were posed in contemplation of securing treatment for Jazmyne in the event that she suffered a latent injury or contracted a sexually transmitted disease. But, the evidence also suggested that Bresee had a dual purpose for her exami-

nation; she clearly sought information as to the identity of the perpetrator and the details of his criminal misconduct. At least some of her questions were in the nature of a child-friendly interrogation, akin to a prosecutorial probing of "who-dunnit," rather than an inquiry related to medical concerns.

Even if Bresee's questions were not intended as an interrogation to aid the prosecution, the details she solicited concerning the sexual abuse and the identity of the perpetrator were not relevant to a medical purpose or the child's health needs. Clearly, some fourteen months after Jazmyne's last incident involving Coates, who no longer had any contact with the child, the questions seemed to have an "overarching investigatory purpose." *State v. Snowden,* 385 Md. 64, 91, 867 A.2d 314 (2005). To illustrate, questions such as "How many times did [Coates] do that to you?", and did you see "anything come out of his private," were not "pathologically germane" to treatment or diagnosis.[24]

In the recent case of *Hall v. UMMS,* 398 Md. 67, 92, 919 A.2d 1177 (2007), which involved the admissibility of medical records under the business records exception to the hearsay rule, the Court said: "When addressing the issue of whether an entire medical record is admissible, generally, we have adhered to the rule that 'statements in a hospital record must be "pathologically germane" to the physical condition which caused the patient to go to the hospital in the first place.'" *Id.* at 92, 919 A.2d 1177. (Citations omitted.) Therefore, only entries in medical records that are pathologically germane, i.e., relevant to the patient's diagnosis or treatment, fall within the business records exception to the hearsay rule. *Id.* at 93, 919 A.2d 1177. *See also State v. Garlick,* 313 Md. 209, 220, 545 A.2d 27 (1988); *Dietz v. Moore,* 277 Md. 1, 7, 351 A.2d 428 (1976); *Wolfinger v. Frey,* 223 Md. 184, 191, 162 A.2d 745 (1960). In *Yellow Cab Co. v. Hicks,* 224 Md. 563, 570, 168 A.2d 501 (1961), the Court defined a

---

24. Bresee's questions to Jazmyne are set forth in the factual summary, *supra*.

"pathologically germane" statement as one that falls " 'within the broad range of facts which ... are considered relevant to the diagnosis or treatment of the patient's condition.' " (Citation omitted.) We are satisfied that the "pathologically germane" standard applies in the context of this case.

Notably, this was not a case in which there was a concern as to the identity of the perpetrator, in order to prevent continued exposure of the child to the abuser. It was known to the State that appellant no longer had any contact with Coates. In contrast, the child's statements in *Cassidy,* implicating her father, were crucial, because it was a CINA case and the question w as whether the child needed to be removed from the home of her parents.

We also consider it significant that Jazmyne saw Bresee more than a year after the end of the sexual abuse, and at a time when she had no physical manifestations of illness or injury. In *Rachel T.,* 77 Md.App. 20, 549 A.2d 27, and in *Webster,* 151 Md.App. 527, 827 A.2d 910, this Court favored admission of the victim's statements, in part, because the victims were seen by the health care providers almost contemporaneously with the abuse, and under emergent circumstances. Simply put, we cannot glean from this record the basis on which Jazmyne would have understood that she was being seen for medical treatment or diagnosis, some fourteen months after the last sexual abuse incident, and three weeks after her disclosure to her mother of what had occurred. For example, there is no indication that Jazmyne had any understanding, at her age, that she was at continued risk of developing a latent, sexually transmitted disease or HIV. Moreover, most eight-year-olds would not discern emergent circumstances or medical necessity in the absence of any medical complaints or symptoms. And, Jazmyne's inquiry as to whether Bresee would find Coates suggests that Jazmyne did not perceive that there was a medical purpose—or even a dual purpose—for the examination.

Certainly, the examination conducted by Ms. Bresee was important. Even fourteen months after the last abusive oc-

currence, a child could be at risk for HIV or an STD, as was later shown here, or in need of mental health counseling. But, given the long delay between the last incident of abuse and the examination, coupled with the fact that Jazmyne was not exhibiting any symptoms of illness, there is no indication that she understood that there was a medical purpose for the examination. The significant lapse of time between the alleged abuse and Jazmyne's statements to Bresee raises concerns as to the circumstantial guarantee of reliability that undergirds the exception.[25] Because we cannot say that Jazmyne comprehended that there was a medical purpose for Bresee's examination, the statements were not admissible under Rule 5–803(b)(4).

Moreover, we disagree with the State's claim that appellant was not prejudiced by Bresee's testimony. Jazmyne's credibility was central to the case, and there is no question that Bresee's testimony corroborated important portions of Jazmyne's testimony. The State's contention that Bresee's testimony was merely cumulative is wholly unconvincing.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

**25.** It is noteworthy that the State has not referred us to a single case in which a child's statements, made so long after the alleged incident, at a time when the child was not experiencing any medical problems, nonetheless qualified for admission under Rule 5–803(b)(4). Our research has also failed to uncover any such cases.